464 A.2d 323

**Anthony A. BARBER, et al.,**

**v.**

**PITTSBURGH CORNING CORPORATION, et al.,**

**v.**

**COMMONWEALTH of Pennsylvania and American Flint Glass Workers Union, AFL–CIO.**

**Appeal of CHARTER CONSOLIDATED LTD., Central Mining Finance, Ltd., and Charter Consolidated Investments Ltd.**

Superior Court of Pennsylvania.

Argued Jan. 13, 1983.

Filed July 1, 1983.

Reargument Denied Sept. 13, 1983.

Petition for Allowance of Appeal Denied Dec. 27, 1983.

286

Werner Polak, Pittsburgh, for appellants and William M. Wycoff, Pittsburgh, submitted a brief, for appellants.

Stanley W. Greenfield, Pittsburgh, submitted a brief, and George Cohen, Pittsburgh, for Barber et al., appellees.

George Edward McGrann, Pittsburgh, for PPG, appellee.

Before POPOVICH, MONTGOMERY and VAN der VOORT, JJ.

MONTGOMERY, Judge:

The instant appeal arises from the lower court's denial of preliminary objections which challenged the *in personam* jurisdiction of the Pennsylvania courts over a foreign corporation named as a defendant in the action. After denying the preliminary objections, the trial court certified, pursuant to Rule 311(b)(2) of the Pennsylvania Rules of Appellate Procedure, that a substantial issue of jurisdiction was presented, and the matter is therefore properly before us for resolution at this time. The issues involved have been the subject of thorough briefs, and oral argument was expertly presented before us by counsel for the respective parties.

The instant case was commenced in August, 1979, by the filing of a Complaint in trespass and assumpsit in the Court

of Common Pleas of Allegheny County. The plaintiffs comprise current and former employees of the Pittsburgh Corning Corporation (hereinafter "Pittsburgh Corning") and spouses of such employees. The spouses' claims are for loss of consortion. The substance of the plaintiffs' action is a claim that the plaintiff employees contracted asbestosis, a serious respiratory disease, as a result of their exposure to asbestos dust and fibers in the course of their employment at Pittsburgh Corning's Port Allegheny Pennsylvania plant. The plaintiffs sought recovery from two general classes of defendants. The first class includes Pittsburgh Corning, Pittsburgh Plate Glass (hereinafter "PPG") and Corning Glass Works, Inc. (hereinafter "CG"), the latter two defendants being joint owners of Pittsburgh Corning. It was generally alleged by plaintiffs that this first class of defendants was either directly or indirectly responsible for the conditions of the employment in which the employee plaintiffs suffered their alleged exposures to asbestos. The second broad class of defendants included Charter Consolidated, Ltd. (hereinafter "Charter"), the Appellant on this appeal [1], and various corporate entities which the parties referred to as the Cape Industries Group or Cape Industries, Ltd. We shall hereinafter refer to these defendants collectively as "Cape", unless a more specific designation of a particular Cape constituent party becomes particularly relevant and requires separate identification. This second general group of defendants was alleged to have been directly or indirectly involved in the mining and sale of asbestos to Pittsburgh Corning. The members of the first class of defendants have each appeared in the lawsuit to defend against the merits of the claims asserted

1. Charter Consolidated Investments, Ltd. and Central Mining Finance, Ltd. which are both subsidiaries of Charter, also filed preliminary objections in the lower court, on jurisdictional grounds, and both have appeared before our Court as co-appellants with Charter in the instant appeal. The record shows that both of the subsidiaries were administrative tools used by Charter to hold the stock of Cape. No separate arguments are offered on this appeal on behalf of either of the subsidiaries. Accordingly, all of the discussion in this Opinion as to Charter should be understood to refer to Charter Consolidated Investments, Ltd. and Central Mining Finance, Ltd. as well.

by plaintiffs. As to the second class of defendants, the record shows no appearance in the case by Cape. Charter entered an appearance in the case and then filed its preliminary objections to the Complaint, seeking to have the action dismissed for lack of *in personam* jurisdiction as to Charter.

The lower court postponed a decision on Charter's preliminary objections and allowed the parties discovery with respect to the jurisdictional question presented. Following the termination of discovery, the lower court held a hearing and accepted briefs from the parties. Finally, the lower court overruled Charter's preliminary objections, and the instant appeal was filed. The basic question presented by this appeal is whether Charter, a foreign corporation, is subject to *in personam* jurisdiction in the courts of our Commonwealth.

In our analysis of this appeal, we will of course be concerned with the factual basis underlying the lower court's assertion of jurisdiction over Charter in this case. However, it is initially appropriate that we review the law which governs the questions of *in personam* jurisdiction over a foreign corporation which are presented by this appeal.

The first reference to authority requires that attention be directed to the statutory provisions which provide for the jurisdiction of the Pennsylvania Courts over a foreign corporation. The so-called "long-arm" jurisdictional statutes were amended by our legislature in 1972, and such amendments were clearly intended to liberalize a somewhat restrictive Pennsylvania jurisdictional view which existed prior to that time. *Garfield v. Homowack Lodge, Inc.*, 249 Pa.Super. 392, 378 A.2d 351 (1977). In reviewing the history of Pennsylvania practice under long-arm rules in 1974, our Court recognized that the 1972 amendments to the long-arm statute were designed to "... remove all Pennsylvania statutory and, therefore, decisional impediments to the exercise of *in personam* jurisdiction over foreign corporations." See *Proctor & Schwartz, Inc. v. Cleveland Lum-*

*ber Company*, 228 Pa.Super. 12, 17, 323 A.2d 11, 14 (1974). The Court, in the same case, noted that: "The statute reinforced through express language the judicially stated public policy of Pennsylvania to extend *in personam* jurisdiction 'to the full measure consistent with due process standards'." (citations omitted) 228 Pa.Super. at 17, 323 A.2d at 14.

The Act of November 15, 1972, as amended, is now set forth, in parts pertinent to the issues presented in this appeal, in 42 Pa.C.S.A. §§ 5301 and 5322. These provisions establish jurisdiction over foreign corporations along two separate approaches. Section 5301 provides for jurisdiction over such an entity that conducts "a continuous and systematic part of its general business within [the] Commonwealth", whether or not the particular cause of action asserted arises "from [the] acts" on which jurisdiction is based.[2] Section 5322, especially in subsection (b), establishes jurisdiction over foreign corporations based upon acts from which the claims of the plaintiff arise. This statutory provision specifically asserts that the jurisdiction of our courts "to the fullest extent allowable under the Constitu-

**2.** Section 5301 provides, in pertinent part:

(a) General rule.—The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person, or his personal representative in the case of an individual, and to enable such tribunals to render personal orders against such person or representative:

* * * * * *

(2) Corporations.—

(i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.

(ii) Consent, to the extent authorized by the consent.

(iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

* * * * * *

(b) Scope of jurisdiction.—When jurisdiction over a person is based upon this section any cause of action may be asserted against him, whether or not arising from acts enumerated, in this section. Discontinuance of the acts enumerated in subsection (a)(2)(i) and (iii) and (a)(3)(i) and (iii) shall not affect jurisdiction or omission occurring during the period such status existed.

tion ... [may be] ... based on the most minimum contact with this Commonwealth allowed under the Constitution." [3.]

■ With respect to the subject of *in personam* jurisdiction over unregistered foreign corporations, we have recognized that the change in policy represented by the 1972 legislative amendments to our "long-arm" statute was merely coexistent with the evolution of substantive jurisdictional due process expressed by the United States Supreme Court. Certainly the landmark modern decision of that

3. Section 5322, provides more fully, in pertinent part:
   (a) General rule.—A tribunal of this Commonwealth may exercise personal jurisdiction over a person (or the personal representative of a deceased individual who would be subject to jurisdiction under this subsection if not deceased) who acts directly or by an agent, as to a cause of action or other matter arising from such person:
   (1) Transacting any business in this Commonwealth. Without excluding other acts which may constitute transacting business in this Commonwealth, any of the following shall constitute transacting business for the purpose of this paragraph:
   (i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.
   (ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.
   (iii) The shipping of merchandise directly or indirectly into or through this Commonwealth.
   
   \*    \*    \*    \*    \*    \*
   
   (3) Causing harm or tortious injury by an act or omission in this Commonwealth.
   (4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.
   
   \*    \*    \*    \*    \*    \*
   
   (b) Exercise of full constitutional power over nonresidents.—In addition to the provisions of subsection (a) the jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301 (relating to persons) to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States.
   (c) Scope of jurisdiction.—When jurisdiction over a person is based solely upon this section, only a cause of action or other matter arising from acts enumerated in subsection (a), or from acts forming the basis of jurisdiction under subsection (b), may be asserted against him.
   
   \*    \*    \*    \*    \*    \*

Court in this area was the famous case of *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945), where the Court stated:

"due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'."

This "minimum contracts" analysis is one our courts have followed since the issuance of the *International Shoe* decision.[4] However, we cannot ignore subsequent explanations of minimum constitutional requirements for the assertion of *in personam* jurisdiction, such as the Court's declaration in *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958): "[I]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Also, we cannot forget the requirement that the plaintiff's cause of action must arise from activities within the forum state by the proposed defendant. See *Garfield v. Homowack Lodge, Inc.*, supra.

In summarizing all of these concepts, our Court has established a two step test for determining whether the exercise of this state's jurisdiction over a particular defendant was constitutional. It was restated not long ago in *Koenig v. International Brotherhood of Boilermakers*, 284 Pa.Super. 558, 568, 426 A.2d 635, 640 (1980):

"First, the defendant must have purposefully availed itself of the privilege of acting within the forum state thus invoking the benefits and protections of its laws ... Secondly, the cause of action must arise from defendant's activities within the forum state ... Lastly, the acts of the defendant must have a substantial enough connection

4. It has been recognized that the current Pennsylvania long-arm legislation, discussed above, "... tracks the two jurisdictional theories defined by the Court in *International Shoe.*" See *Strick Corp. v. A.J.F. Warehouse Distributors, Inc.*, 532 F.Supp. 951, 955 (E.D.Pa.1982).

with the forum state to make the exercise of jurisdiction over it reasonable. . .

If it appears that this test is not satisfied, the second step is to decide whether the non-resident defendant's activities in Pennsylvania unrelated to the cause of action were 'continuous and substantial.' " (citations omitted).

■ With these legal concepts in mind, it is next appropriate that we review the record for facts germaine to the jurisdictional issue presented. The record established that Charter is an English corporation engaged generally in a variety of commercial transactions primarily in the fields of mining, manufacturing and finance. Its mining operations involve mostly minerals from Africa. Its manufacturing, through various subsidiaries to be more particularly discussed below, includes asbestos insulation and building products, mining equipment and railroad track fasteners. Its financial operations include investments in other commercial entities, such as mining companies. Charter also often acts as a business agent for other companies in various fields.

Charter may best be described, in general, as a holding company, which conducts virtually all of its business through wholly owned or majority owned subsidiaries. These subsidiaries are within Charter's four main divisions, which are Mining, Industrial, Finance and Administration and Services. Thus, for instance, Charter's headquarters staff, including executives, are formally employed and paid by a wholly owned subsidiary.

Charter's Industrial Division is not a department of the type one might envision in a more typical business entity, but actually consists of a collection of subsidiaries, including two groups of companies which are significant in the instant case because of their involvement in business transactions in Pennsylvania. These are Cape and the Pandrol Group. The record shows clearly that Charter conducts the affairs of its Industrial Division by exercising control over the operations of its industrial subsidiaries.

As noted, the transactions of Cape are highly significant in the resolution of the jurisdictional issue presented by this appeal. While Charter sought to divorce itself from Cape and to depict it as an almost unrelated entity, the record clearly refutes such a position. It shows that Cape is a principal operating subsidiary of Charter which has provided 16.9% of Charter's income, according to answers to interrogatories. This income was derived from Cape's involvement as the owner of asbestos mines in South Africa. Of greatest import in this case has been the business involved in Cape's sales, between 1964 and 1972, of thousands of tons of asbestos to Pittsburgh Corning for use at the Port Allegheny Pennsylvania facility where the Plaintiffs have been employed. The lower court in this case noted in its opinion that the parties stipulated to the jurisdiction of the Pennsylvania courts over Cape, which is clear under 42 Pa.C.S.A. § 5322.

Charter maintains that its relationship with Cape is not such that Cape's business transactions in Pennsylvania should be significant in supporting the *in personam* jurisdiction of the Pennsylvania courts over Charter. However, although Cape may technically appear to be an independent business entity, the record shows clearly the extent to which it comprises an operating arm of Charter. As mentioned earlier, it has produced over one-sixth of Charter's income. Charter in fact is the owner of over two-thirds of the common stock of Cape and has acquired all of its preferred shares. In the course of its purchase of such firm control of Cape over several years, Cape announced the following in a prospectus accompanying its offer to buy fifty percent of all then outstanding shares:

"It is Charter's purpose to make use of the wide experience of Cape's management so that Cape can become the main channel for the expansion of Charter's industrial activities of this type; this could not be satisfactorily achieved unless Charter acquired a considerably larger holding such as would give Charter control of Cape."

The record makes it clear that since it acquired such a substantial ownership of Cape, Charter has been well represented by its own executives placed on Cape's Board of Directors, and has thereby participated in Cape's important business decisions. This total involvement by Charter in Cape's affairs was clearly significant to the lower court in its finding that through Cape, Charter has engaged in business affairs in Pennsylvania to a degree sufficient to assert *in personam* jurisdiction over Charter.

Also significant to the same conclusion was Charter's relationship to the Pandrol Group, and the Pennsylvania business transactions of Pandrol. There is no question that the Pandrol Group has engaged steadily in business affairs in our Commonwealth. Pandrol International, Ltd., which is wholly owned by Charter, and Pandrol, Inc., wholly owned by Pandrol International, Ltd., have manufactured and sold various types of railroad track equipment. For many years prior to the filing of the instant suit, they have sold this equipment themselves or through an entity known as United Rail Anchor, located in Pittsburgh. Pandrol International, Ltd. was not only registered to do business in Pennsylvania from 1975 through 1978, but paid taxes and even maintained a bank account in our State.

There appears to be no dispute of the conclusion that the Pandrol Group has been actively engaged in business in Pennsylvania to the extent that it is subject to the *in personam* jurisdiction of our courts.[5] Although Charter again seeks to segregate itself from Pandrol in the face of this jurisdictional problem, the facts simply do not support Charter's position. It is clear that Pandrol is not an independent entity, even if set up as a separate business corporation under the law. Rather, it is clearly a business division of its corporate owner, which controls all of its operations. Charter does this not only through its total ownership of Pandrol but also through placement of its executives on Pandrol's Board of Directors. Charter dictates Pandrol's policies just as another business entity

5. 42 Pa.C.S.A. § 5301 clearly applies as to Pandrol.

would control the activities and directions of one of its operating divisions. It simply cannot be realistically maintained that Charter and Pandrol are, in substance, independent entities.

In addition to the evidence in the record as to the activities of Cape and Pandrol, the record also contains evidence of direct participation in Pennsylvania business transactions by Charter representatives and employees. In the course of discovery in this case. Charter refused to supply information about such contacts with our Commonwealth occurring more than one year prior to the filing of this suit. Nevertheless, while so limiting its responses, Charter still disclosed several significant individual business forays into our Commonwealth by its employees. Some of these contacts were of extended duration, and involved meetings, sales, technical consultations, business planning and even a securities transaction.

More specifically, the record shows that during an eight month period in 1979, Charter sold columbite to a customer in Boyertown, Pennsylvania. These sales were made on behalf of one of Charter's clients from Nigeria. In connection with that transaction, Charter's manager of metals sales in its Mining Division met in June, 1979, in Pennsylvania, with representatives of the customer. In another case, a different Charter representative, from its Mining Division, met in Pittsburgh in April, 1979, with Pennsylvania customers to discuss orders for acid plant compressors. The supplier in that case was a Charter client situated in Zaire. Similarly, during the same month, a third Charter representative met in Pittsburgh with representatives of the U.S. Bureau of Mines, to discuss remote control devices manufactured by another Charter client. In still another transaction, a different Charter employee, Dr. Sage, met in Pittsburgh in November, 1978 and again in March, 1979 with representatives of U.S. Steel and some from Foote Minerals Company, for the purposes of discussing transactions involving business and research projects. During 1979, Charter's Finance Division purchased 3000 shares of stock

through a Philadelphia stock brokerage. Such activities by Charter agents, during the limited period covered by Charter's responses in discovery, were also considered by the lower court to lend weight to the conclusion that Charter should be subjected to the *in personam* jurisdiction of our Courts, under 42 Pa.C.S.A. § 5301.

After thorough consideration of the record as a whole, we conclude that the lower court was correct in its determination on the *in personam* jurisdiction issue presented in this case. We find that Charter's involvements in Pennsylvania satisfy the tests set forth in *Koenig v. International Brotherhood of Boilermakers*, supra., and other cases so that an assertion of Pennsylvania court jurisdiction over Charter is clearly constitutional. More particularly, we first find it evident that Charter has purposely availed itself of the privilege of acting within Pennsylvania and thus invoked the benefits and protections of our laws. Charter did this constantly and repeatedly over the years preceding the filing of this suit in its conduct of recurring business affairs through its Cape and Pandrol operations as well as the individual acts of various representatives. The second requirement, that the cause of action must arise from the defendant's activities within the forum state, is clearly satisfied. In light of the allegations of the Plaintiffs' Complaint, this occurred in its sale of asbestos to their employer. The third requirement is that the acts of Charter must have been substantial enough with regard to Pennsylvania so that our courts' exercise of jurisdiction over Charter is reasonable. Again, there is no question that the activities of Charter, through Cape, Pandrol and various individual representatives, has been both continuous and substantial in Pennsylvania. The extent of these commercial transactions makes the assumption of jurisdiction completely reasonable and proper in this case.

■ Some mention of the contentions raised by Charter is appropriate. Charter contends that under the holdings of

*Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) and *Botwinick v. Credit Exchange, Inc.*, 419 Pa. 65, 213 A.2d 349 (1965), it cannot be subjected to the jurisdiction of Pennsylvania courts because Cape and Pandrol comprise independent corporations, not subject to Charter's direction and control. We find that Charter's reliance upon these precedents is misplaced in light of the facts produced before the lower court in this case. Moreover, we find that the modern trend in decisional law lends further weight to the conclusion that jurisdiction was properly asserted over Charter in this case. In *Cannon*, the Supreme Court held that a Maine corporation could not be subjected to the jurisdiction of the courts of North Carolina despite its ownership of all of the capital stock of another corporation which was engaged in business affairs in North Carolina. The Court, in an opinion by Justice Brandeis, refused to ignore the separate formal corporate existence of each company. While the Supreme Court respected the separate incorporation of the subsidiary, it is noteworthy that it specifically declared that its ruling should not be taken as having uniform application: "(S)uch use of a subsidiary does not *necessarily* subject the parent corporation to the jurisdiction" of North Carolina. (emphasis supplied) 267 U.S. at 337, 45 S.Ct. at 251. In *Botwinick*, our Pennsylvania Supreme Court, relying in part upon *Cannon*, held that a New York corporation was not "doing business" within Pennsylvania even though it had a subsidiary which was a Pennsylvania corporation. The Court found that the subsidiary, which had a separate corporate existence, was not a mere instrumentality of the New York corporation. While reaching that conclusion upon the facts presented in that case, the Court in *Botwinick* nevertheless acknowledged that a subsidiary's activities might well cause its parent to become subject to the jurisdiction of the courts in a state where the subsidiary was engaged in business activities:

"There is a well recognized exception to these general rules if the record demonstrates that the subsidiary is the

"alter ego" of the parent to the extent that domination and control by the parent corporation renders the subsidiary a mere instrumentality of the parent; under such extreme circumstances the parent corporation may be held to be doing business within the state under the facade of the subsidiary."

The lower court in the instant case determined, under the standards of *Botwinick*, and the facts of record, that Charter's control over both Pandrol and Cape was of a sufficient degree to consider each but an instrumentality of Charter. We agree with such conclusions. It cannot be forgotten that Charter is itself only a holding company which has chosen to perform all its business functions through operational arms that happen to be set up legally as separate corporations. Despite such separate incorporation, Charter's total control over Cape and Pandrol is so clear, that to reach any other conclusion in this case would be to blindly exhault form over substance. Charter itself has made these separate corporations constituent parts of its various operating divisions. As explained at length by the lower court, Charter has retained and exercised full control over these subsidiaries through their Boards of Directors. We agree that the degree of control, of both Cape and Pandrol, is sufficient for the proper assertion of Pennsylvania jurisdiction over Charter, even based upon the pronouncements of the *Botwinick* court.

■ Charter's arguments as to a lack of an *alter ego* relationship, and reliance upon *Botwinick*, ignore other factors in the case. These involve the activities of Charter's own employees, for various commercial purposes, in our Commonwealth in the year prior to the filing of this suit. It is clear that the lower court was justified in finding that these activities constituted "a continuous and systematic part of its general business" of sufficient magnitude to make it fair and reasonable to exercise jurisdiction over Charter under 42 Pa.C.S.A. § 5301. We do not have any

particular mechanical rule which we follow in these cases, but must determine on an *ad hoc* case by case basis whether the "minimum contacts" of a foreign corporation have been sufficient to justify the assumption of jurisdiction over it by our courts. *Proctor & Schwartz, Inc. v. Cleveland Lumber Company*, supra. The analysis of the substantiality of the business transactions conducted cannot depend on any comparative dollar volume test involving the defendant's total sales volume, as such a ratio test would invariably favor the multimillion dollar corporations over those with smaller sales volumes. *Hendrickson v. Reg O Co.*, 657 F.2d 9, 12–13 (3rd Cir.1981). It has been stated that the proper inquiry is whether the defendant's "conduct and connection with [the state] are such that [it could] reasonably anticipate being haled into court" there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). We find that Charter's own business contacts in our Commonwealth justify the assertion of jurisdiction over it, even without regard to the evidence of domination and control of its subsidiaries which are clearly engaged in business in our State.

This conclusion is mandated by the record, which demonstrates that even within the limited period of time for which it submitted responses in discovery, Charter's own business contacts with our State were quite diverse in nature, and broad in scope. The record shows that in a single twelve month period, several different Charter representatives, from at least three of its separate operating divisions, visited our Commonwealth for business transactions. These direct business involvements by Charter were not limited to a single customer or business project, but included five separate Pennsylvania based customers or concerns, and dealt with matters as diverse as sales of minerals, acide plant compressors, and remote control devices, and other business projects and research endeavors. Further, during the same limited time period about which it made disclo-

sures, Charter was not only a seller, but also purchaser, obtaining 3000 shares of stock in a transaction through a Philadelphia broker. Based upon these transactions, all within the year prior to the filing of this suit, we find no merit in Charter's claim that it had not itself engaged in business in our Commonwealth sufficient to justify the assertion of jurisdiction by our courts.

Earlier, we had noted that the modern trend in judicial thought would favor the assertion of jurisdiction over Charter in this case. The modern cases, of course, rely upon the *International Shoe Co. v. Washington* "minimum contacts" type of analysis. The lower court cited the case of *Energy Reserves Group v. Superior Oil Co.*, 460 F.Supp. 483 (D.C.Kan.1978) as an instructive case on the question of whether a parent corporation may be subjected to the jurisdiction of a state's courts solely because of the activities of its subsidiaries within that state. We find the reasoning of the Court in *Energy Reserves* to be logical and helpful, and direct the reader to that case, especially including its criticism of the holding in the *Cannon Manufacturing Co. v. Cudahy Packing Co.* case, supra. In *Energy Reserves* the Court found the assertion of jurisdiction in Kansas to be proper over a foreign corporation, based solely upon the business activities within the State of Kansas by a subsidiary that was a separate corporation. The Court explained the less stringent modern constitutional analysis in such cases mandated under the *International Shoe* decision. We believe the "minimum contacts" analysis, and a recognition of the commercial reality of Charter's domination and control of Cape and Pandrol, make it clear that Charter is subject to the jurisdiction of our Pennsylvania courts.

Finally, we note that it is well-established as a rule that when preliminary objections, if sustained, would result in the dismissal of an action, such objections should be sus-

tained only in cases which are clear and free from doubt. *Botwinick v. Credit Exchange, Inc.,* supra. Moreover, when deciding a motion to dismiss for lack of personal jurisdiction the court must consider the evidence in the light most favorable to the non-moving party. *Lieb v. American Pacific International, Inc.,* 489 F.Supp. 690, 694 (E.D.Pa. 1980). With these concepts in mind, it is clear that no basis exists in the instant case to disturb the findings of the lower court on the question of jurisdiction presented.

The order of the lower court denying preliminary objections is affirmed, and the case is remanded for further proceedings. Jurisdiction is not retained.