**Virginia PARKER, Executrix of the Estate of Arthur W. Parker, Deceased, and Virginia Parker in her own right**

v.

**BELL ASBESTOS MINES, LTD., et al.**

**Leroy HALL**

v.

**LAC D'AMIANTE DU QUEBEC, LTD., et al.**

**Edward O. COOK and Barbara Cook, his wife**

v.

**CAREY CANADA, INC., et al.**

Civ. A. Nos. 83–3289, 84–130 and 83–1516.

United States District Court, E.D. Pennsylvania.

May 6, 1985.

Robert E. Paul, Philadelphia, Pa., for plaintiffs.

Daniel Segal, Philadelphia, Pa., for Charter.

Vincent McGinness, Philadelphia, Pa., for Lac D'Amiante.

## MEMORANDUM AND ORDER

Before FULLAM, BECHTLE and SHAPIRO, District Judges.

FULLAM, District Judge.

The three judges to whom the captioned cases are assigned have jointly heard argument on the pending motions of defendants Charter Consolidated, P.L.C. and Charter Consolidated Investment, P.L.C. for summary judgment. The motions raise essentially identical issues in the three cases, issues which may have significant impact upon a great many pending asbestos-related cases. This Memorandum expresses the views of the three judges involved, and disposes of the summary judgment motions in all three cases. The differences among the three cases, in their facts and the precise details of the pleadings, have no bearing on the pending motions. Where necessary for purposes of illustration, the record in the *Parker* case will be utilized.

Plaintiffs, citizens and residents of Pennsylvania, seek to recover damages occasioned by their, or their decedents', exposure to asbestos in the course of their employment, during various periods between 1941 and 1981. The ultimate issue presented by the pending Motions for Summary Judgment is whether plaintiff may have a legal basis for imposing liability upon the moving defendants, Charter Consolidated, P.L.C. ("Charter"), Charter Consolidated Investments, P.L.C. (CCI) (hereinafter sometimes jointly referred to as "the Charter defendants").

Plaintiffs allege, in substance, that the Charter defendants "mined, manufactured, produced and/or sold asbestos fiber and/or asbestos products either directly or indirectly to the plaintiff's employer" (*Parker* Complaint, ¶ 2(e), (f)). Actually, as all parties acknowledge, the Charter defendants have never themselves mined or sold or supplied asbestos or asbestos products; their involvement in this litigation is predicated upon their relationship with Cape Industries, an English holding company which, in turn, through its wholly owned subsidiaries, was engaged in the mining and sale of asbestos in South Africa, during the relevant period. Charter owns CCI, which is operated essentially as the investment division or department of Charter; CCI owns 67.3% of the stock of Cape Industries which, until June 1979, was extensively engaged in asbestos mining and sale, through wholly owned subsidiaries.

For many, many years, asbestos mined and sold by Cape Industries was marketed extensively in this country; indeed, Cape Industries had an American subsidiary, North American Asbestos Corp., which handled the marketing and distribution of its products throughout this country.

Cape Industries, North American Asbestos, and various other subsidiaries of Cape Industries, were named as defendants in a great many asbestos-related lawsuits in this country. In the latter part of 1977, the Cape Industries interests paid $1.1 million as their share of a settlement of certain asbestos-related litigation in Texas. On the very day when this occurrence came to the attention of the Cape Industries Board, the Board agreed promptly to implement a

re-organisation of the Group's asbestos selling arrangements, particularly in the U.S.A., which in future would be more closely controlled from South Africa. As part of this re-organisation it is proposed that North American Asbestos Corporation should be wound up.

Ex. 3 to supplemental brief of Lac D'Amiante du Quebec, Ltd., at p. 3. The dissolution of North American Asbestos Corporation was completed as of May 1978.

At about the same time, acting on the basis of extensive legal advice from both English and American lawyers, Cape adopted, and has since carried out, a firm policy of simply ignoring litigation against it in courts in the United States, on the theory (which, at least for present purposes, must be deemed valid) that default

judgments against it in American courts cannot be enforced against it in England or elsewhere (*see, e.g.,* Charter's annual report for 1982, quoted in LAQ's supplemental brief at p. 5 n. 5). Apparently, Cape has also instructed its insurers not to defend any such lawsuits (*id.* p. 4 & n. 3).

In June 1979, Cape completely divested itself of its asbestos-mining subsidiaries. The mines were sold to Transvaal Consolidated Land and Exploration Company (TCL), a South African concern. Cape obligated itself to indemnify the purchaser against valid and enforceable judgments arising out of asbestos litigation then pending or instituted within three years after the sale; but it was a condition of the indemnity agreement that the purchaser would not appear in, defend, or otherwise participate in any such litigation in the United States (*i.e.,* TCL would continue the policy of allowing default judgments to be entered).

Plaintiffs and the other parties opposed to the Charter defendants' motions [1] contend that the Charter defendants exercised direct control over these decisions and actions by Cape Industries, and that the circumstances warrant imposition of liability directly upon the Charter defendants, without regard to the formalities of the corporate structure. That is, they argue that the Charter defendants represent merely the alter ego of Cape Industries, and that the corporate veil should be pierced.

In support of their summary judgment motions, the Charter defendants advance a host of arguments: the corporate structure was adopted for perfectly legitimate reasons having nothing to do with asbestos litigation; the evidence establishes that the Charter defendants did not in fact exercise the required degree of control over Cape Industries; the complained-of actions by Cape Industries were neither fraudulent, illegal, nor contrary to public policy, but merely self-protective; and there is no precedent for imposing alter ego liability

except in the case of closely held corporations.

## DISCUSSION

■ The parties agree that Pennsylvania law is applicable in this diversity litigation. In Pennsylvania, as in most jurisdictions, it is permissible to disregard corporate formalities only in exceptional circumstances. *See, e.g., Zubik v. Zubik,* 384 F.2d 267 (3d Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). The corporate entity being disregarded must be so controlled as to have essentially no "mind" of its own; but this alone is insufficient. There must also be a showing that the corporate entity is being used "to defeat public convenience, justify wrong, protect fraud or defend crime". *Sams v. Redevelopment Authority,* 431 Pa. 240, 244, 244 A.2d 779, 781 (1968). More recently, the Pennsylvania Supreme Court has observed that the "legal fiction of a separate corporate entity was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy demand and when the rights of innocent third parties are not prejudiced nor the theory of the corporate entity rendered useless." *Ashley v. Ashley,* 482 Pa. 228, 237, 393 A.2d 637, 641 (1978).

■ The test is the same when the corporate relationship involves a parent and subsidiary. Like a majority shareholder in any corporation, the corporate parent is not liable for the acts of the corporate subsidiary unless the parent actually exercises control of the subsidiary. *See Botwinick v. Credit Exchange, Inc.,* 419 Pa. 65, 213 A.2d 349 (1965); 1 C.V. Swearingen, *Fletcher Cyclopedia of the Law of Private Corporations,* § 43 at p. 474 (rev. ed. 1983). The decision in each case is fact-specific. As indicia of control, courts tend to look to such matters as shared officers and directors, and the extent of the parent's domination of the subsidiary's policies, practices, and finances. *See, e.g., In re Penn Central Securities Litigation,*

---

**1.** Although plaintiffs do oppose the Motions for Summary Judgment, the most strenuous opposition comes from co-defendants, spearheaded by counsel for Lac D'Amiante du Quebec, Ltd.

335 F.Supp. 1026 (E.D.Pa.1971); *Fletcher, supra,* § 43 at p. 472 and supplement § 43.20 at p. 34. No one factor is alone dispositive.

An appropriate starting point on the issue of control is the decision in *Barber v. Pittsburgh Corning Corp.,* 317 Pa.Super. 285, 464 A.2d 323 (1983), *allocatur denied,* Dec. 27, 1983, *cert. denied,* — U.S. —, 104 S.Ct. 2387, 81 L.Ed.2d 346 (1984). It was there held that Pennsylvania courts could properly exercise personal jurisdiction over Charter in an asbestos case arising out of Cape's activities in the state. Reviewing a record much the same as the record now before us, the court found that Charter's relationship with Cape was one of "total involvement." 464 A.2d at 329.[2]

The Charter defendants argue that the standard applied by the *Barber* court in reaching its jurisdictional decision is less stringent than the one to be applied on the issue of control in the veil-piercing context. We disagree. The jurisdictional question is resolved by looking to the control issue only. While this does not resolve the broader issue of disregard of corporate entity, it satisfies the first aspect of the test for veil-piercing.[3] Indeed, many of the cases relied upon by all parties to describe the control necessary to pierce the corporate veil are cases concerned with the threshold issue of personal jurisdiction. *See, e.g., Botwinick, supra; Hargrave v. Fibreboard Corp.,* 710 F.2d 1154 (5th Cir. 1983).

The *Barber* court's discussion of Charter's control over Cape reflected but one of two alternative bases for its decision and, arguably, may be *dictum;* but it is nevertheless persuasive. Our own independent review of the voluminous record in this case persuades us that, at the very least, there are substantial issues of material fact as to whether Charter's control of Cape is sufficiently pervasive to satisfy the first prong of the veil-piercing test. On this record, the Charter defendants are not entitled to summary judgment on that issue.

Upon its formation, Charter owned, by virtue of the involvement with Cape of one of Charter's forerunners, Central Mining & Investment Corp. (CMIC), 16.8% of the shares of Cape's stock. One to two CMIC executives sat on Cape's Board before the merger, and this practice was continued by Charter. Gradually, Charter began increasing its ownership of Cape. In 1969, Charter successfully attempted a "takeover" (so-called by Cape's chairman and managing director at the time, Ronald Dent—*see* Dent Deposition at 48–49), of Cape, as a result of which it acquired nearly 63% of Cape's common stock, and all of its preferred shares. At present, Charter's share of Cape's common stock has increased to 67.3%.

In making its 1969 tender offer, Charter advised Cape's shareholders that Charter's business

> is allied to the building and light engineering activities of Cape and it is in the opinion of Charter desirable to make use of the wide experience of Cape's management to expand and develop this side of the Charter group's activities.

**2.** On remand, the trial court in *Barber* granted Charter's Motion for Summary Judgment, without filing an opinion. *Barber v. Pittsburgh Corning Corp.,* No. G.D. 79–21544 (Pa.C.P.Ct. Oct. 11, 1984); *see also Westerby v. Raymark Industries, Inc.,* No. 83–61 (D.N.J. Jan. 22, 1985) (order granting Charter defendants' summary judgment motion).

**3.** Charter cites the opinion of Judge Takiff of the Philadelphia Court of Common Pleas, denying its Motion for Summary Judgment (because the record was incomplete), as support for its theory that a different standard applies. *See Figueroa v. Charter Consolidated P.L.C.,* March Term 1983, No. 4351 (2123) (Phila.Com.P.C. June 12, 1984). A close reading of Judge Takiff's memorandum opinion reveals that he concluded only that *Barber* alone could not be used by the *Figueroa* plaintiffs to estop Charter from defending on the corporate veil theory; in so doing, he reasoned that "the corporate veil cannot be pierced merely by a showing of control"; rather, "it must be specifically proven that 'one in control of a corporation uses that control, or uses the corporation assets, to further his or her own personal interests.'" *Id.* at 3 (citations omitted). The court left open the question whether Charter had sufficient control over Cape to pierce the corporate veil, and allowed plaintiffs further discovery on this issue.

However, Charter's present holding of 25.3 percent in Cape is clearly not sufficient if that company is to be the main channel for the expansion of Charter's industrial activities; it was, therefore, considered necessary to acquire a considerably larger holding which would give Charter control of Cape.

Rudland Ex. A at 1493; *see also* Rudland Ex.B at 1434.

Cape thus became Charter's "principal industrial subsidiary". *See* Ex. 8, Appendix to LAQ's supplemental brief, at 2198. Not surprisingly, Charter then increased its representation on the Cape Board to three directors. (Dent testified that he assured Charter's managing director Sidney Spiro that two directors would be sufficient since the Cape Board voted by consensus; nevertheless, Spiro demanded three and Dent acquiesced. Dent at 70.) These directors were members of the Charter Board's Executive Committee—a committee composed of Charter Board members who also typically functioned as department or division heads; the Executive Committee, which met two to three times each week, was responsible for Charter's day-to-day operations and for the oversight of Charter's investments. *See* Stopford-Sackville at 29, 35.

Charter is careful to point out that its nominees to Cape's Board were non-executive directors, meaning that they served "only" on Cape's Board, but not on its executive committee. Nevertheless, one may not ignore the fact that these non-executive directors typically served Cape as deputy chairman (whose duties included membership in the committee which set the salary and remuneration of all of the directors) and as chairman of the Board, and that Cape did not even have an executive committee until some time after the Charter Board suggested that one be formed in 1967. Rudland Ex.B at 1426. And, quite obviously, the role of the nominees was not simply to "mind" the Cape investment, but to convey to Cape the views of the parent and see to their implementation. The minutes of the meeting of Charter's Executive

Committee on October 29, 1970, for example, contain the following reference to Cape:

Discussions have taken place with Cape directors concerning the future management of that group. It has been decided that Mr. R.H. Dent should continue as Chairman but the position of Managing Director, which he has held hitherto, will be filled by Mr. G.A. Higham from the 1st January 1971. Mr. F.P. Parks will be Assistant Managing Director.

Rudland Ex.B at 1454. At this meeting, *inter alia*, were Sidney Spiro, Managing Director of Charter and Deputy Chairman of Cape's Board, and Lionel G. Stopford-Sackville, also a member of Cape's Board.

Stopford-Sackville recalled a luncheon meeting attended by Charter's nominees to the Cape Board and the other non-Charter non-executive Board members, at which it was decided that Higham should replace Dent, subject to Spiro's "canvassing" the executive directors, except for Higham and Dent. Stopford-Sackville at 124. Dent testified that he too was at this meeting and had suggested Higham and Parks for the position. Dent at 128, 136. Spiro remembered that Dent himself determined who his successor should be. Spiro at 38.

But the question is not simply one of succession; a determination was being made as to how Cape should be run. Dent testified that it was Spiro who initiated the idea of a change in the structure of Cape's leadership, asking Dent to think about giving the role of managing director to someone else and to suggest possible successors. Dent at 127–28. Nor did this occur, as Spiro suggested, shortly before Mr. Dent's retirement. Spiro at 38. Dent remained as chairman of Cape until 1979, when he was replaced by Stopford-Sackville of Charter and then by Higham. Dent did, however, begin to draw his pension when he gave up his position as an executive director in 1975, five years after the luncheon meeting. Dent at 6.

Moreover, shortly after Charter's acquisition of its majority interest in Cape in 1969, Spiro asked Dent to take on the chair-

manship of three wholly owned industrial subsidiaries. Dent at 124–25. (It would thus appear that Spiro's repeated assertions that this was done after Dent stepped down as managing director of Cape in January of 1971 may be erroneous. *See* Spiro at 15–16.) And, notwithstanding Spiro's statement that Dent's service in this role was only "a very short-lived experience" (Spiro at 35), Dent testified that he served in this capacity for three years and then stepped down voluntarily (Dent at 125).

As noted above, Dent remained on the Charter Board until he retired as chairman of Cape in 1979. One year later, Higham assumed that role (he was still managing director of Cape) and was appointed to the Charter Board. That same year, Higham was "seconded" by Charter, the result being that he spent half his time with Cape and half with Charter. In so doing, he relinquished his role as managing director of Cape but retained Cape's chairmanship and his benefits with the company. At the same time, he assumed the leadership of Charter's Industrial Division and is thus on Charter's Executive Committee. He is paid by Charter (Cape is apparently debited for its share of him), and he testified: "I normally go to Cape on Monday and Tuesday each week and I go to Charter on Wednesday and Thursday each week and on Friday I do whatever is necessary." Higham (April 8, 1981) at 177.

■ There is more—more Charter Executive Committee minutes evincing Charter's desire to impose certain policies on Cape's management (*see, e.g.,* Rudland, Ex. B at 1459, 1464, 1465, 1469) and, as Stopford-Sackville noted, Cape usually fulfilled Charter's desires (Stopford-Sackville at 80–81); Charter's role as registrar for Cape and underwriter of two rather large share issues by Cape (*see, e.g.,* Rudland Ex. A at 1487, Ex. B at 1444, 1451); Charter's consolidation, in compliance with English law, of Cape's profits with its own; and so on—but in light of the foregoing, it is not necessary to describe the corporate interconnections in any greater detail. Making every inference in favor of the party moved against,

as we are required to do at this stage, it is clear that the evidence of Charter's control of Cape presents a genuine issue of fact.

We thus proceed to the second part of the test for disregarding the corporate veil. As noted above, the equitable doctrine quite logically provides that the corporate entity may be disregarded where it is being used in an inequitable fashion.

Charter makes much of the fact that the courts of Pennsylvania and elsewhere require illegality or fraud in order to pierce the corporate veil, and that none of Cape's activities, even if they are attributed to Charter, constitute such egregious behavior. We assume, however, that when the Pennsylvania Supreme Court repeatedly states that the corporate entity may not be used "to defeat public convenience, justify wrong, protect fraud or defend crime," and that the form will be disregarded "whenever justice or public policy demand....," the court means exactly what it says. *See Ashley, supra,* 482 Pa. at 237, 393 A.2d at 641; *Sams, supra,* 431 Pa. at 244, 244 A.2d at 781.

The fact that the Pennsylvania courts have not had occasion to elaborate on what is meant by inconvenience (the cases deal primarily with fraud), does not rob the term of its common meaning, nor deprive it of its legal effect. Long ago, the Supreme Court took note of the need to provide an American citizen with a forum in this country when the fund in dispute was located in England. *See Phelps v. McDonald,* 99 U.S. (IX Otto) 298, 25 L.Ed. 473 (1878). The Court asked: "[W]hy should not this question of paramount right be settled in this case, rather than that the American claimant should be subjected to the delay, expenses, and other inconveniences of a suit before a foreign tribunal?" *Id.* at 308. While we now possess methods superior to those existing in 1878 for crossing the Atlantic, most asbestos plaintiffs are ill-equipped to undertake the sort of trans-Atlantic, if not trans-global, litigation, necessitated by Cape's apparently evasive maneuvers. The expense alone supplies the inconvenience in this case. Add to that the

ill-health and age of many of these plaintiffs, and there simply can be no doubt.

Nor can we ignore the state court's admonition that the corporate form must be disregarded "whenever justice and public policy demand." Thus, although limitation of liability is a legitimate benefit of incorporation, that benefit is lost where the corporate form is resorted to "deliberately, with specific intent to escape liability for a specific tort or class of torts...." *Zubik, supra,* 384 F.2d at 273. And there is no rational basis for distinguishing between formation of a corporation for these purposes and use of an already existing entity to achieve them. *See Fletcher* Supp. § 43.20 at 34. In either event, a distinction may be drawn between (1) carrying out the everyday affairs of corporate business (*e.g.,* the mining and sale of asbestos)—the sort of activity which traditionally merits the privilege of limitation of liability bestowed by the protective corporate form; and (2) carrying out legal maneuvers aimed at maximizing the limitation of liability to a point of near invulnerability to responsibility for injury to the public. In our view, the latter, which may well be the situation here, constitutes an abuse of privilege, which in an equitable analysis of competing public policy considerations must surely fail.

As mentioned previously, the record reveals that on the same day that the Cape Board was advised of its $1.1 million contribution to a settlement of asbestos litigation in Texas, the Board proposed a

> re-organisation of the Group's asbestos selling arrangements, particularly in the U.S.A., which in future would be more closely controlled from South Africa. As part of this re-organisation it is proposed that North American Asbestos Corporation should be wound up.

Appendix to LAQ's supplemental brief, Ex. 3 at 3. Present at this meeting were all three Charter executives who were nominees to Cape's Board, including Cape's deputy chairman. North American Asbestos Corp. (NAAC),[4] a wholly owned subsidiary of Cape, was dissolved in May 1978.

Thereafter, acting on English and American legal advice, Cape's management resolved that it would not appear in any asbestos suits brought against it in the United States (*see* Higham (July 5, 1984) at 62–63), the prevailing corporate belief being that default judgments entered against Cape in the United States could not be enforced against it in England. *See* 1982 Charter Annual Report, *quoted in* LAQ's supplemental brief at 5 n. 5. Cape also appears to have instructed its insurers not to defend any such suits. *See* LAQ's supplemental brief at 4 & n. 3.

In June 1979, Cape completely divested itself of its South African asbestos mines; the mines were sold to Transvaal Consolidated Land and Exploration Co. (TCL), a South African firm. The Cape-Charter board members recalled that negotiations for the sale originated perhaps as early as the mid-1970s for various reasons, including the decline in the profitability of asbestos ventures and the political obstacles involved in doing business with South African firms. *See, e.g.,* Richardson at 28; Higham at 68; Dent at 82. None of these gentlemen could recall the sale being primarily motivated by a desire to be rid of liability-rich assets. As noted above, however, the agreement of sale indemnified TCL for any judgment arising out of asbestos claims existing at the time of sale or instituted within three years thereafter. The terms of the indemnification included the condition that the purchaser not appear to defend actions instituted in the United States; *i.e.,* this protection was conditioned on TCL defaulting in American lawsuits. *See* Appendix to LAQ's Supplemental Brief, Ex. 4 at C1000142–143. Thus, although as Higham observed, TCL was not thereby absolutely precluded from defending suits in this country, it was effectively

---

4. By virtue of the name, it is difficult to accept the puzzling contention of Charter (and its many directors) that "none of the Charter nominees can identify NAAC as a Cape subsidiary which allegedly sold asbestos in the United States." Charter Reply Memorandum at 48.

deprived of whatever incentive it may have had to do so.

In our view, the issue whether Cape management, by these acts[5] deliberately sought to escape liability is a second disputed issue of material fact which precludes the entry of summary judgment.

We do not, of course, hereby attach liability to Charter. It is clear, however, that if the plaintiff and LAQ can prove that Charter controls Cape, and that Cape has deliberately avoided liability to American plaintiffs, it will be fair to ask Charter to stay and defend Cape's position. Motions denied.

---

**5.** By necessary implication, we have rejected Charter's contention that post-tort (asbestos exposure) activities may not constitute the basis for piercing the corporate veil. *See, e.g., Morgan. v. Burks,* 93 Wash.2d 580, 611 P.2d 751 (1980) (post-tort fraudulent corporate conveyances were properly considered by the jury); *Fletcher, supra,* § 45 at 533. In any event, there is evidence that Charter was effectively in control of Cape by mid-1969, well before the events complained of occurred, and well within plaintiff's decedent's exposure period.