### In re BDW ASSOCIATES, INC., Debtor.

### Bankruptcy No. 86–2398.

United States Bankruptcy Court,
W.D. Pennsylvania.

July 14, 1987.

Stephen J. Laidhold, Lampl, Sable, Makoroff & Libenson, Pittsburgh, Pa., for petitioning creditors.

Philip E. Beard, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., for debtor.

James G. Dunn, Designated Officer, BDW Associates, Inc., Wymard, Dunn & Gordon, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Presently before the Court is BDW Associates, Inc.'s (hereinafter "BDW") *Motion To Dismiss The Involuntary Petition* brought by Busy Beaver Building Center, Inc., Fagens, Inc., and Jackel Development Co., Inc., (hereinafter "Petitioning Creditors"). BDW asserts that these claims are improperly asserted against it, they being debts of Point View Construction Company, Inc. (hereinafter "Point View"), BDW's sister corporation. The Petitioning Creditors claim that Point View and BDW are actually one and the same; BDW contends that the propriety of piercing the corporate veil raises a "bona fide dispute", which necessitates dismissal of the involuntary filing pursuant to 11 U.S.C. § 303(h)(1).

Testimony and argument were offered on April 15, 1987; thereafter, the parties submitted briefs on these issues. After thorough review of the relevant case law, this Court finds that no bona fide dispute exists; that BDW and Point View are one and the same; and that an Order for Relief will be entered, rendering BDW a debtor under Chapter 7 of the Code.

## FACTS

Point View is a corporation whose sole shareholder, president, and secretary is

Joan Marie Letters. BDW was originally a partnership of three individuals—William Bannow, James Dunn, and Francis Wymard. It was later incorporated, with Bannow, Dunn, and Wymard acting as officers, and Bannow and Wymard as the shareholders.

Point View acted as a general contracting company, soliciting bids from subcontractors to work on the development of real estate. BDW, a real estate developer, purchased undeveloped land, hired Point View to operate as a general contractor to build on the land, and sold it, unit by unit, after construction was completed. BDW's development project was financed by Horizon Financial which purportedly holds a security interest in the bulk of BDW's assets; additionally, the individuals are personally obligated as guarantors.

Ms. Letters is a full-time employee of BDW. Her *sole* functions relating to Point View were the execution of subcontracts, and the signing of corporate checks. All negotiations for Point View were conducted by Bannow, ostensibly as an agent of Point View.

A chair, desk, and telephone were set up at BDW's offices in order to receive telephone calls and correspondence for Point View; no individual was directed to or in fact utilized the work station. Connie Smith, also an employee of BDW, received and gave all of Point View's messages and mail to Wymard. Ms. Smith shared the authority to sign Point View corporate checks with Ms. Letters; however, she was not an officer or director, nor was she an employee or shareholder of Point View.

The standard operating procedures for Point View business transactions were as follows:

1) subcontractors submitted bills to Point View for supplies and labor ("hard costs");

2) Point View, by its agents, Bannow and/or Wymard, submitted these bills to BDW—no additional general contracting fees were added by Point View;

3) Bannow and/or Wymard, now representing BDW, added "soft costs", such as overhead and profit, and submitted the bills to Horizon for funding;

4) Horizon issued a check for the total amount to BDW;

5) BDW, through Bannow and/or Wymard, subtracted its "soft costs" and transmitted the balance to Point View;

6) Point View, by Bannow and/or Wymard, delivered corporate checks to Ms. Letters for signature, said checks being drawn to the order of the various subcontractors; and

7) Bannow and/or Wymard arranged for distribution of the checks to the subcontractors.

Bannow and Wymard operated under an unwritten agency agreement with Point View, both to supervise all site work, and handle all business/office administration. Neither received any remuneration from Point View (although Bannow alone spent almost six (6) years as a full-time supervising agent on the last Point View/BDW project). Nor did Ms. Letters ever receive any compensation from Point View, although she was the sole officer, director and shareholder. Bannow and Wymard also arranged for additions to be built onto their individual residences, and billed these services to Point View. Ms. Letters was never advised of this activity.

Point View held no corporate meetings and kept no minute books; no stock certificates were ever issued. Point View never received any money from any source in return for its services as general contractor for BDW, and it worked for no one else.

The unit-by-unit sales of the developed real estate did not progress with the speed or profit originally anticipated. When Point View became delinquent in repaying its suppliers, a meeting was held at Busy Beaver's headquarters to discuss placing Point View on C.O.D. status, and to create credit balances, offered by BDW, for the use of Point View. Bannow and Wymard attended this meeting; Ms. Letters did not.

This involuntary bankruptcy was filed against BDW on September 17, 1986. BDW filed its Motion To Dismiss on March 2, 1987.

An involuntary petition was also filed against Point View—on October 3, 1986.

On November 25, 1986, Point View, by and through its counsel, the "D" in BDW, consented to the entry of the Order for Relief. The Order was submitted and entered on November 28, 1986.

Thereafter, Point View filed its Schedules of Affairs on December 30, 1986. Said Schedules revealed total assets of only $692.72, and total liabilities, all unsecured, of $544,990.10.

## ANALYSIS

Pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984, creditors petitioning the Court to place a debtor in bankruptcy must meet certain criteria. One of these requirements is that each creditor's claim must be free of bona fide dispute. 11 U.S.C. § 303. Since the enactment of this language, the Courts have been wrestling with the concept, and have tried to create a test to determine the presence of a bona fide dispute. *In re Reid,* 773 F.2d 945 (7th Cir.1985); *Matter of Busick,* 65 B.R. 630 (N.D.Ind.1986); *In re Stroop,* 51 B.R. 210 (D.Colo.1985); *In re Garland Coal & Mining Company,* 67 B.R. 514 (Bankr.W.D.Ark.1986); *In re Ross,* 63 B.R. 951 (Bankr.S.D.N.Y.1986); *In re Cates,* 62 B.R. 179 (Bankr.S.D.Tex.1986); *In re Lough,* 57 B.R. 993 (Bankr.E.D.Mich. 1986); *In re Johnston Hawks Ltd.,* 49 B.R. 823 (Bankr.D.Haw.1985).

The first test was enunciated by the Court in *Johnston Hawks,* which stated that the following factors should be considered:

1) The nature of the dispute;

2) The nature and extent of the evidence and allegations presented in support of the creditor's claim and in support of the debtor's contrary claim;

3) Whether the creditor's claim and the debtor's claims are made in good faith and without fraud or deceit;

4) Whether on balance the interests of the creditors outweigh those of the debtor;

49 B.R. at 831.

Thereafter, the *Stroop* Court found that the appropriate standard was that applied to summary judgment motions.

... if the defense of the alleged debtor to the claim of the petitioning creditor raises material issues of fact or law so that a summary judgment could not be rendered as a matter of law in favor of the creditor on a trial of the claim.

51 B.R. at 212. *See also, In re Cates, supra.*

The next court to discuss this issue found difficulties with both the *Johnston Hawks* and *Stroop* tests. The Court in *Lough* found that the *Johnston Hawks* test improperly considered a balancing of the debtor's and creditor's interest, and unjustifiably allowed consideration of subjective intention. 57 B.R. at 996. Similarly, the *Lough* Court found the *Stroop* test to be unsatisfactory because it did not "fully address a case when there is substantial dispute as to the proper application of law but no substantial issue of fact." *Id.* at 997. The Court therefore found that "... if there is a bona fide dispute as to either the law or the facts, then the creditor does not qualify and the petition must be dismissed." *Id. See also, In re Garland, supra; Matter of Busick, supra.*

BDW cites the case of *In re Reid, supra* for the proposition that claims which require the piercing of the corporate veil are the subject of bona fide dispute. We find that said Seventh Circuit decision is factually distinguishable from the case at bar. While the *Reid* decision provides substantial legal history, it offers little analysis to support its holding. Indeed, after reading both the majority and dissenting opinions, it appears that the District Court, which found that Reid was the alter ego of his corporation, was reversed due to insufficient factual substantiation, and not, on the basis of a legal principle. This is supported by the concurring Judge's request that further evidence be obtained to "determine whether the dispute as to Reid's liability is bona fide." 773 F.2d at 948.

In the instant case, however, the Court has been provided with substantial testimony upon which to base a decision. Therefore, as there are presently no precedents

which specifically state that actions to pierce the corporate veil are *per se* the subject of a bona fide dispute, the facts of this case and the applicable law must be outlined. A factual recitation of the instant matter precedes this analysis. We therefore turn to a presentation of the law on this issue, both as it stands in Pennsylvania, and in federal application thereof.

No court may summarily ignore the formal differences between related corporations. *American Bell Inc. v. Federation of Telephone Workers*, 736 F.2d 879 (3rd Cir.1984). However, the fiction of the separate corporate entity will be disregarded,

[w]henever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless.

*American Kitchen Foods, Inc. v. Hersch Cold Storage Company*, 435 F.Supp. 1127, 1131 (W.D.Pa.1977); *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637 (1978); *Gagnon v. Speback*, 389 Pa. 17, 131 A.2d 619 (1957).

Specifically, the court in *Ashley* stated that:

... whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate entity may properly be disregarded.

393 A.2d at 641, *citing Watercolor Group Inc. v. Newbauer*, 468 Pa. 103, 360 A.2d 200 (1976).

A finding that one entity is the alter ego of another is a factual determination. *Carpenters Health and Welfare Fund v. Kenneth R. Ambrose Inc.*, 727 F.2d 279 (3rd Cir.1983); *Publicker Industries Inc. v. Roman Ceramics Corporation*, 603 F.2d 1065 (3rd Cir.1979); *Parker v. Bell Asbestos Mines, Ltd.*, 607 F.Supp. 1397 (E.D.Pa. 1985). The standards applied by the courts to allow the taking of such steps are as follows:

(1) ... the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime.

*Zubik v. Zubik*, 384 F.2d 267, 272 (3rd Cir.1967); *see also, American Bell Inc., supra; Publicker Industries, supra; Parker, supra; George A. Davis, Inc. v. Camp Trails Company*, 447 F.Supp. 1304 (E.D. Pa.1978); *Sams v. Redevelopment Authority*, 431 Pa. 240, 244 A.2d 779 (1968); and

(2) ... when it is "determined that the corporate fiction is being used by the corporation *itself* to defeat public convenience, justify wrong either to third parties dealing with the corporation ... (or the corporate form is used to) perpetrate a fraud or some other similar reprehensible conduct."

*American Kitchen Foods, Inc., supra* at 1132, *quoting Sams, supra* at 781 (emphasis added). *See also, Parker, supra.*

The Court in *Zubik* went on to state that the evaluation of "fraud" or "injustice" in a bankruptcy case is different from standard corporate control cases.

... The defrauded creditor or "victim" of a business transaction with an under-capitalized corporation, for instance, often has a strong case for piercing the veil of a "sham" corporation. See 63 A.L.R.2d 1051. The controversy in such cases invariably involves some degree of reliance by the plaintiff, contributing to the fraud, or undue advantage or trick accenting the injustice ...

384 F.2d at 273.

The following non-exclusive list of factors has been considered by the Third Circuit in determining the propriety of disregarding a corporate identity:

1) gross undercapitalization;

2) failure to observe proper corporate formalities;

3) nonpayment of dividends;

4) insolvency of the debtor corporation;

5) siphoning of funds by the dominant stockholder;

6) nonfunctioning of other officers or directors;

7) absence of corporate records; and

8) the fact that the corporation is merely a facade for operations of the dominant stockholder or stockholders.

*American Bell, Inc., supra; Carpenters Health and Welfare Fund, supra; United States v. Pisani,* 646 F.2d 83 (3rd Cir.1981).

By incorporating the facts of the case at bar into the law as it stands in this jurisdiction, our determination of "no bona fide dispute" would be the same, regardless which of the aforementioned tests we would utilize.

If we employ the "balancing test" proposed by the Court in *Johnston Hawks,* we find that the weight of the factors balances in favor of the Petitioning Creditors. In hearing this dispute as to the propriety of piercing the corporate veil, the Petitioning Creditors have presented clear and convincing evidence of the unity between BDW and Point View, said evidence being uncontroverted. The Petitioning Creditors have proceeded in good faith, without fraud, to recover overdue accounts. The Debtor has responded by claiming that the debts are those of another, although it is clear that the creation of the BDW/Point View separation was no more than a maneuver to avoid the payment of these and other bona fide debts; and, on balance, the interests of the creditors substantially outweigh the interests of the Debtor.

Analyzing the case through the *Stroop* court's "summary judgment" test, we achieve the same result. When making this determination on a summary judgment standard, the Court must consider as fact any pleading, admission, deposition, testimony, or affidavit which remains uncontroverted. *See Manetas v. International Petroleum Carriers, Inc.,* 541 F.2d 408 (3rd Cir.1976); *Shaughnessy v. Penn Central Transportation Company,* 454 F.2d 1223 (3rd Cir.1972); *Kress, Dunlap & Lane, Ltd. v. Downing,* 286 F.2d 212 (3rd Cir. 1960). In the case at bar there is no genuine dispute of the facts; none of the evidence presented has been contested. Therefore, summary judgment could be rendered as a matter of law in favor of the Petitioning Creditors.

The *Lough* "summary judgment plus" test merely takes *Stroop* one step further, stating that the existence of either a genuine factual issue, or a meritorious contention as to the application of law to the undisputed facts will create a bona fide dispute requiring dismissal of the involuntary petition.

In the instant case we have already established the lack of factual dispute. Additionally, we have outlined the nonexhaustive laundry list of factors enunciated by the Third Circuit as regards piercing the corporate veil. In applying same we find as follows:

1) Point View was and is grossly undercapitalized, indicating total assets of $692.72;

2) Point View held no corporate meetings, kept no corporate minutes, and issued no stock certificates;

3) Point View never paid any dividends, as it always possessed insufficient assets;

4) Point View operated only on BDW projects and never received any compensation therefrom;

5) Point View is insolvent; and

6) Point View was and is a facade for BDW's operations. Ms. Letters was a figurehead, possessing no firsthand knowledge as to the construction business, and even less awareness of Point View's daily activities, which were completely overseen by Bannow and Wymard. Point View was used solely as a business conduit—a "straw" party whose only purpose was to act as a buffer between BDW and its various subcontractors.

In order for BDW to prevail on its request for dismissal of this involuntary petition, it must present sufficient proof to contradict the Petitioning Creditors' claims, *inter alia,* show that the debt was not owed by BDW and that BDW and Point View are not one and the same. While the offer need not be substantial or even sufficient to win at trial, the Debtor cannot merely rest on its pleadings once the Petitioning Creditors have met their burden. The Debtor has failed to offer any proof

other than conclusory statements, which is insufficient.

Justice and public policy demand that the creditors be made whole; neither Point View nor BDW can claim protection of innocent parties—there are none. It is the Petitioning Creditors in this case who are victims, having been tricked into relying upon Point View's sham corporate existence and BDW's financial backing. While the actions of BDW might not be fraudulent, even in the bankruptcy context, they were and are improper and have wrought substantial injustice. The corporate veil must be pierced. BDW will be adjudged a Debtor, an Order for Relief will be entered and the Debtor will be directed to comply with the Order by filing the necessary and appropriate Schedules and Statements.

An appropriate Order will be issued.