J-A02021-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| JOHN WILLIAMS, AN INCAPACITATED PERSON, BY BRANDY WILLIAMS, GUARDIAN (AD LITEM); JOHN WILLIAMS, BRANDY WILLIAMS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | No. 938 WDA 2017 |
| OAO SEVERSTAL, SEVERSTAL RESOURCES, PBS COALS, INC; MINE SAFETY APPLIANCES COMPANY | |
| v. | |
| TRI-STATE SAFETY TRAINING SERVICES | |
| APPEAL OF: OAO SEVERSTAL | |

Appeal from the Order May 31, 2017
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s): 1396 of 2014

BEFORE: BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    FILED OCTOBER 03, 2019

OAO Severstal ("Appellant") appeals from the May 31, 2017 order overruling its preliminary objection to the trial court's exercise of personal jurisdiction. We affirm.

On April 19, 2012, John Williams suffered severe injuries while working for Merit Contracting, Inc. constructing a raw coal bin at the Shade Creek

Plant, a coal facility owned by Appellant's subsidiary, PBS Coals, Inc. ("PBS").

On June 9, 20 14, Mr. Williams, both individually and through his guardian ad litem (hereinafter "Mr. Williams"), filed a complaint against Appellant and PBS Coals. Appellant responded by filing preliminary objections that asserted, inter alia, that the trial court lacked personal jurisdiction. On April 6, 2017, following extensive discovery, including the deposition of two former PBS Coals executives and a former board member, who is also Appellant's Chief Executive Officer ("CEO"), the trial court overruled Appellant's preliminary objections as to personal jurisdiction. On May 31, 2017, the trial court amended the order to certify that the case presented a substantial issue of personal jurisdiction. See Pa.R.A.P. 311(b)(2). This timely appeal followed.

Appellant presents three questions for our review:

A. Whether the trial court committed an error of law when it denied [Appellant's] preliminary objection to the court's exercise of specific personal jurisdiction over it . . . [pursuant to] 42 Pa.C.S. § 5322 . . . ?

B. Whether the trial court's holding that it had specific personal jurisdiction under 42 Pa.C.S. § 5322 over [Appellant], a Russian corporation, in this personal injury action is inconsistent with the due process requirements of the 14th Amendment?

C. Whether a plaintiff suing an out-of-state defendant should be required to plead the existence of personal jurisdiction and facts in support thereof?

Appellant's brief at 6 (unnecessary capitalization omitted).

At the outset, we address Appellant's assertion that Mr. Williams was required to plead the existence of personal jurisdiction. This claim is identified

- 2 -

as issue "C" in Appellant's statement of questions presented. Id. The argument requires us to interpret the Pennsylvania Rules of Civil Procedure; therefore, it is a question of law over which our standard of review is de novo and our scope of review is plenary. See Tillery v. Children's Hosp. of Phila., 156 A.3d 1233, 1249 (Pa.Super. 2017).

Appellant's argument is without merit because this Court has repeatedly held that "when a defendant challenges a court's personal jurisdiction, that defendant bears the burden of supporting such objections to jurisdiction by presenting evidence. The burden of proof only shifts to the plaintiff after the defendant has presented . . . evidence in support of its preliminary objections challenging jurisdiction." Trexler v. McDonald's Corp., 118 A.3d 408, 412 (Pa.Super. 2015) (cleaned up); see Scoggins v. Scoggins, 555 A.2d 1314, 1317 (Pa Super. 1989); Schmitt v. Seaspray–Sharkline, Inc., 531 A.2d 801, 803 (Pa.Super. 1987). Hence, Mr. Williams was not required to plead facts in his complaint supporting the exercise of personal jurisdiction over Appellant. Instead, he was entitled to aver the facts supporting the exercise of personal jurisdiction in his response to Appellant's preliminary objections and thereafter present evidence in support of those averments. Accordingly, we conclude that Appellant is not entitled to relief on this claim of error.

We address Appellant's remaining claims collectively. Essentially, Appellant argues that Mr. Williams adduced insufficient facts to demonstrate that his cause of action arose out of Appellant's contacts with Pennsylvania.

Appellant's primary contention is that personal jurisdiction is not conferred to Pennsylvania simply because PBS Coals is one of its subsidiaries. Appellant continues that, absent evidence that Appellant controlled PBS Coals' decision-making in relation to the coal bin's construction, it did not have sufficient minimum contacts with Pennsylvania to attach personal jurisdiction that satisfies the due process considerations outlined in the Fourteenth Amendment.

Mr. Williams counters by highlighting that the trial court's determination is based upon acts that stemmed from Appellant's ownership and control of its subsidiary. He argues, "The undisputed acts found by the [t]rial [c]ourt all arose from [Appellant's] ownership and management of PBS Coals. Construction at the Shade Creek Plant was merely one aspect of [Appellant's] management and operation of PBS Coals." Appellee's brief at 8-9.[1]

_____

[1] The contentions that Mr. Williams asserted on appeal regarding the level of Appellant's oversight in the parent-subsidiary relationship with PBS Coals and the trial court's review of that relationship clearly implicate the alter-ego/mere instrumentality theory of personal jurisdiction. To the extent that Mr. Williams did not express this precise argument on appeal, our review is not constrained by the assertions leveled in an appellee's brief. Indeed, it is well settled that this Court may affirm the trial court's order on any basis supported by the record. See, e.g., Preferred Contractors Ins. Co., RRG, LLC v. Sherman, 193 A.3d 1009, 1022 n.3 (Pa.Super. 2018). Thus, insofar as the certified record supports the trial court's decision to overrule Appellant's preliminary objections, this Court may affirm that order regardless of the arguments that Mr. Williams asserted in his brief.

We review a trial court's order overruling preliminary objections for an abuse of discretion and "[we] must consider the evidence in the light most favorable to the non-moving party.[2]"  Sulkava v. Gaston Finland Oy, 54

_____

[2] There are two distinct classifications of preliminary objections pursuant to Rule 1028(a): 1) objections that directly challenge the adequacy of the pleading, i.e., subparagraphs (a)(2), (3), and (4); and 2) objections that raise challenges that transcend the four corners of the pleading.  As the note to Rule 1028(a) explains, objections that relate to a nonconforming pleading, insufficient specificity in a pleading, and a demurrer need no additional evidence and may be determined from the face of the pleading.  However, unlike preliminary objections that are self-evident, preliminary objections that implicate, inter alia, personal jurisdiction require additional evidence.

Relying upon Nutrition Management Services Co. v. Hinchcliff, 926 A.2d 531 (Pa.Super 2007), the concurrence asserts that the extensive discovery conducted in this case was superfluous because Appellant's preliminary objections "did not cast doubt upon the jurisdiction-conferring allegations in the complaint."  See Concurring Memorandum at 7.  We disagree.  In Nutrition Management Services Co., supra at 536, this Court concluded that there was no need to develop an evidentiary record prior to sustaining a preliminary objection where "neither party presented evidence that raised factual issues which required the creation of an evidentiary record."  We highlighted, "there was no need to develop an evidentiary record [because] there is no indication that [the plaintiff] sought to depose any [out-of-state-defendants] prior to oral argument.  Moreover, [the plaintiff] fails to identify a single factual issue that needs to be resolved." Id.  Hence, we concluded that, even though the out-of-state defendant "readily admitted" to the actions that formed the factual basis of the Pennsylvania plaintiff's assertion, those allegations did not support the exercise of personal jurisdiction.  Id.  Stated in the parlance of the concurrence, discovery was not warranted prior to sustaining the preliminary objection in that case because the plaintiff failed to proffer any "jurisdiction-conferring allegations in the complaint" upon which the defendants were required to cast doubt.  See Concurring Memorandum at 7.

The case at bar presents a drastically different situation.  Rather than sustaining a preliminary objection because the plaintiff neglected to assert a factual basis for the trial court to exercise personal jurisdiction, the trial court

A.3d 884, 889 (Pa.Super. 2012). Furthermore " This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or an abuse of discretion. Once the moving party supports its objections to personal jurisdiction, the burden of proving personal jurisdiction is upon the party asserting it." Id.

Considering the corporate dynamics that this case presents, we do not believe that the trial court abused its discretion in overruling Appellant's preliminary objection to the trial court's exercise of personal jurisdiction. Appellant is an international steel manufacturing behemoth. PBS Coals, a Delaware corporation with headquarters in Somerset County, Pennsylvania, is

_____

ordered discovery to "adduce and submit . . . facts that would allow [it] to make a determination relative to the Preliminary Objections, based upon . . . jurisdiction." Trial Court Order, 11/25/14, at 2-3. Instantly, Appellant's preliminary objection contested the factual bases of Mr. Williams's assertions of jurisdiction, i.e., that because PBS Coals was Appellant's agent, instrumentality, or alter ego in Pennsylvania, Appellant owed a duty to Williams as an invitee at the Shade Creek Plant owned by PBS Coals. In fact, in arguing that its corporate relationship with PBS Coals was insufficient for Pennsylvania to exercise personal jurisdiction, Appellant stressed that it did not have a direct ownership interest in PBS Coals or operate the subsidiary at the time of the accident. See Preliminary Objection at 8, ¶ 30. Furthermore, Appellant averred that it neither maintained bank accounts, licensing, offices, or a business address in Pennsylvania; nor did it employ personnel, own property, or pay taxes in the Commonwealth. Id. at 8, ¶ 29. As Appellant's contentions challenged the factual basis of Mr. Williams's assertion of jurisdiction, i.e., that Appellant's acts, or its corporate relationship with PBS Coals, gave rise to the cause of action in Pennsylvania, discovery was warranted.

one of Appellant's myriad wholly-owned subsidiaries.[3]   Appellant's ownership of PBS Coals twists through a series of international subsidiaries, including holding companies in Russia, the Netherlands, and Canada, and two domestic companies incorporated in Delaware.   PBS Coals' purpose was to produce metallurgical coal for Appellant's in-house consumption in its steel making operations in North America.   Although the caption also lists Severstal Resources as a defendant in this case, that is not a corporate entity.   In reality, "Severstal Resources" is an informal sobriquet that Appellant uses to identify its mining units collectively.   N.T. Deposition of Lori Mason, 9/9/15, at 119-21; Exhibit 2.   In this vein, the name "Severstal" and the concomitant logo that was emblazoned on PBS Coals' letterhead, business cards, and signs, represents a brand name, whose use and depiction were controlled by Appellant.[4]

In addition to the enumerated acts specified in 42 Pa.C.S. § 5322(a),[5] the Pennsylvania long-arm statute confers jurisdiction to "the fullest extent

_____

[3] In addition to PBS Coals, Appellant owned Rox Coal, Inc., a different coal mining subsidiary under the Severstal brand that operated out of PBS Coals' Somerset headquarters.   The interdependent relationship between Rox Coal and PBS Coals existed prior to Appellant's acquisition of those assets.

[4] The Severstal name and logo are not only imprinted on the service contract between PBS Coals and Merritt Construction, Mr. Williams's employer when the injury occurred, but are also posted atop the insurance and compliance certifications that were executed simultaneously with the contract.

This section of the long-arm statute provides:

_____

(a) General rule.--A tribunal of this Commonwealth may exercise personal jurisdiction over a person (or the personal representative of a deceased individual who would be subject to jurisdiction under this subsection if not deceased) who acts directly or by an agent, as to a cause of action or other matter arising from such person:

(1) Transacting any business in this Commonwealth. Without excluding other acts which may constitute transacting business in this Commonwealth, any of the following shall constitute transacting business for the purpose of this paragraph:

(i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.

(ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.

(iii) The shipping of merchandise directly or indirectly into or through this Commonwealth.

(iv) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth.

(v) The ownership, use or possession of any real property situate within this Commonwealth.

(2) Contracting to supply services or things in this Commonwealth.

(3) Causing harm or tortious injury by an act or omission in this Commonwealth.

(4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

(5) Having an interest in, using, or possessing real property in this Commonwealth.

allowed under the Constitution of the United States and may be based on the

most minimum contact with this Commonwealth allowed under the

_____

> (6)(i) Contracting to insure any person, property, or risk located within this Commonwealth at the time of contracting.
>
> (ii) Being a person who controls, or who is a director, officer, employee or agent of a person who controls, an insurance company incorporated in this Commonwealth or an alien insurer domiciled in this Commonwealth.
>
> (iii) Engaging in conduct described in section 504 of the act of May 17, 1921 (P.L. 789, No. 285), known as The Insurance Department Act of 1921.
>
> (7) Accepting election or appointment or exercising powers under the authority of this Commonwealth as a:
>
> (i) Personal representative of a decedent.
>
> (ii) Guardian of a minor or incapacitated person.
> (iii) Trustee or other fiduciary.
>
> (iv) Director or officer of a corporation.
>
> (8) Executing any bond of any of the persons specified in paragraph (7).
>
> (9) Making application to any government unit for any certificate, license, permit, registration or similar instrument or authorization or exercising any such instrument or authorization.
>
> (10) Committing any violation within the jurisdiction of this Commonwealth of any statute, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit.

42 Pa.C.S. § 5322(a)(1)-(a)(10) (foot note omitted).

Constitution of the United States" See 42 Pa.C.S. § 5322(b). As explained below, we disagree with Appellant's assertion that it and PBS Coals maintained a typical parent-subsidiary relationship that was insufficient to confer personal jurisdiction upon Appellant in Pennsylvania. To the contrary, Appellant's corporate structure and oversight of PBS Coals' mining operations for its internal consumption of metallurgical coal negates the jurisdictional protections that a foreign parent corporation typically enjoys pursuant to Daimler AG v. Bauman, 571 U.S. 117 (2014), and Bristol-Myers Squibb Co. v. Superior Court, 137 S. Ct. 1773 (2017), two decisions that limited states' personal jurisdiction over out-of-state defendants. Moreover, while Appellant did not specifically oversee the construction of the raw coal bin where Mr. Williams was injured during 2012, such a precise connection to the injury is not required. Instead, Appellant's use of PBS Coals to internally source its demand for metallurgical coal rendered the subsidiary the mere instrumentality of the parent company. Thus, acknowledging the coal bin's role in the mining operations, the facts in this case support the trial court's decision to exercise specific personal jurisdiction over Appellant. See Bristol-Myers Squibb Co., supra at 1780 ("In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum.") (cleaned up).

In Daimler AG, supra at 762, the High Court explained that the requirement of personal jurisdiction should "permit out-of-state defendants to

structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." (citation and quotation marks omitted).[6] Similarly, the Supreme Court's holding in Bristol-Myers Squibb, supra at 1781, required "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State." Instantly, Mr. Williams's injury arose from the construction of a coal bin that PBS Coals utilized in its operations to meet Appellant's demand for metallurgical coal.

While agency-based theories such as instrumentality, piercing the corporate veil, and alter ego are typically utilized to exercise general jurisdiction, there is neither an express bar nor conceptual restraint that precludes applying those principles to specific jurisdiction where, as here, the cause of action flows from the veiled action of the foreign parent.[7] Regardless

_____

[6] In a nod to a hypothetical that the High Court posed in Daimler, supra at 121-22, the learned dissent posits that, by exercising general personal jurisdiction over Appellant in this case, we open a theoretical gateway for a Ukrainian citizen to sue Appellant in Pennsylvania for injures that arise in Alaska. See Concurring/Dissenting Memorandum at 12 n.7. Though imaginative, the dissent's hypothetical is unpersuasive for the identical reasons that Justice Sotomayor rejected its counterpart in Daimler. Stated plainly, where "foreign plaintiffs su[e] a foreign defendant based on foreign conduct," the suit has no relation to the forum state, and "given that a more appropriate forum is available," the "exercise of jurisdiction would be unreasonable"— which is a bedrock principle of jurisdiction. Daimler supra at 143-44, (Sotomayor Concurring).

[7] The dissent's reference to BNSF Ry. Co. v. Tyrrell, 137 S.Ct 1549 (2017) is not instructive insofar as that case does not address the principles of

of the name given the test to determine specific personal jurisdiction, the relevant jurisdictional principles of minimum contacts, fair play, and substantial justice remain static. See Jennifer A. Schwartz, PIERCING THE CORPORATE VEIL OF AN ALIEN PARENT FOR JURISDICTIONAL PURPOSES: A PROPOSAL FOR A STANDARD THAT COMPORTS WITH DUE PROCESS, 96 Cal. L. Rev. 731, 735 (2008) (advocating for "jurisdictional veil-piercing jurisprudence related to alien parents of U.S. subsidiary corporations in the context of specific jurisdiction."). Ultimately, the analysis centers on whether it is reasonable to extend jurisdiction to an alien parent corporation based upon its actions within the forum as transmitted through the conduit of its wholly-owned subsidiary.

This is not a novel perspective. Indeed, the Daimler Court specifically noted the applicability of agency theories to specific personal jurisdiction. Id. at 759 n.13 ("Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction."). Moreover, other courts have employed

_____

agency, instrumentality, or alter ego that are at the heart of this case. Indeed, BNSF concerns a Montana court's attempt to extend general personal jurisdiction to an out-of-state corporate defendant with negligible ties to Montana in a lawsuit with no connection to Montana. Echoing the reasoning that it employed in Daimler AG, the High Court concluded, inter alia, "BNSF [is not] so heavily engaged in activity in Montana as to render it essentially at home in that State." Id. at 1559 (cleaned up). Instantly, the certified record is replete with evidence that ties Appellant to the underlying litigation in Pennsylvania through its control over PBS Coals. Hence, the foreign corporation is subject to the Commonwealth's specific personal jurisdiction even though Pennsylvania is not its home forum for the purpose of determining general personal jurisdiction.

similar theories to establish specific jurisdiction over foreign parent corporations based upon the contacts its subsidiary has to the forum and litigation. See Celgard, LLC v. SK Innovation Co., Ltd., 792 F.3d 1373, 1379 (Fed. Cir. 2015) ("For purposes of specific personal jurisdiction, the contacts of a third-party may be imputed to the defendant under either an agency or alter ego theory. In order to establish jurisdiction under the agency theory, the plaintiff must show that the defendant exercises control over the activities of the third-party"); In re Chinese-Manufactured Drywall Prods. Liab. Litig., 753 F.3d 521, 531 (5th Cir. 2014) (interpreting Daimler as embracing significance of principal-agent relationship in specific-jurisdiction analysis); see also Gerlinde Berger-Walliser, RECONCILING TRANSNATIONAL JURISDICTION: A COMPARATIVE APPROACH TO PERSONAL JURISDICTION OVER FOREIGN CORPORATE DEFENDANTS IN US COURTS, 51 Vand. J. Transnat'l L. 1243, 1275 (2018) (discussing Daimler and its progeny, "it remains uncertain if, in the future, the Court will allow the actions of a third party, including a subsidiary not completely dominated by its out-of-state parent corporation, to be transposed to the defendant who has not purposefully availed itself of that forum."). Thus, a finding that an undercapitalized Pennsylvania subsidiary is acting as the agent, instrumentality, or alter ego of a foreign parent corporation can form a foundation for a court to exercise specific personal jurisdiction.

Typically, a corporate parent, such as Appellant, retains its distinct identity even though it may share common directors, officers, and shareholders with a subsidiary. See Botwinick v. Credit Exch., Inc., 213 A.2d 349, 354 (Pa. 1965). As a separate legal entity, a parent corporation is generally not subject to the jurisdictions of its subsidiaries, absent overt interaction with the forum state that would satisfy the minimum contacts standard established in International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Botwinick, supra at 352-53. However, to the extent that the certified record demonstrates that the parent and subsidiary are so intertwined that the subsidiary is the instrumentality of the parent corporation, then the parent may be considered to be doing business within the state under the facade of the subsidiary. Id. at 354. In Botwinick, our Supreme Court addressed whether a parent company was "doing business" through its subsidiaries for purposes of determining personal jurisdiction. It articulated this determination as follows:

> Neither the similarity of names between the parent and subsidiary corporation nor the total ownership of the stock of the subsidiary by the parent nor the fact that a single individual is the active chief executive of both corporations will per se justify a court in piercing the corporate veil if each corporation maintains a bona fide separate and distinct corporate existence.

Botwinick, supra, at 353-54 (citations omitted).

The determination of whether a subsidiary is merely the instrumentality of its parent corporation depends on the manner in which a parent conducts and maintains its relationship with the subsidiary. In re Enter. Rent–A–Car

Wage & Hour Emp't Practices Litig., 735 F. Supp. 2d 277, 317 (W.D. Pa. 2010), aff'd, 683 F.3d 462 (3d Cir. 2012) (whether exercise of jurisdiction over parent corporation is proper under alter-ego theory depends upon details of relationship between parent corporation and its subsidiary).  Thus, it is a fact-based inquiry that focuses on the specific acts that demonstrate the parent company's control over its subsidiary.  Id.

While there is a dearth of authoritative precedent addressing this principle following our High Court's decision in Botwinick, our sister jurisdictions in the federal courts have honed the pertinent inquiry as follows:

> As part of this inquiry, courts in this District often consider the following discrete factors: (1) ownership of all or most of the stock of the subsidiary; (2) common officers and directors; (3) a common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) an integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance of business functions by the subsidiary which the principal corporation would normally conduct through its own agents or departments; (9) marketing by the subsidiary on behalf of the principal corporation, or as the principal's exclusive distributor; and (10) receipt by the officers of the subsidiary corporation of instruction from the principal corporation.  . . . These factors are best viewed as a non-exclusive guide to help resolve the broader issue of whether the companies have a "single functional and organic identity."

Simeone ex rel. Estate Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH, 360 F.Supp.2d 665, 675-76 (E.D. Pa. 2005).

The test involves a "flexible, pragmatic inquiry into all relevant factors that relate to the intimacy of the parent-subsidiary relationship."  Arch v. American Tobacco Co., Inc., 984 F. Supp. 830, 837 (E.D. Pa. 1997)).

Moreover, as the District Court for the Middle District of Pennsylvania explained, "[t]he alter-ego test for personal jurisdiction is 'less stringent' than the test for piercing the corporate veil to impose liability. No single factor is dispositive, and the court may consider all relevant evidence to determine whether the parent exercises actual control over a subsidiary beyond that which is characteristic of a usual parent-subsidiary relationship." Sincavage v. Schott North America, 2018 WL 4852218 (M.D. Pa. 2018) (cleaned up); In re Enter. Rent–A–Car, supra at 319; see also Clark v. Matsushita Elec. Indus. Co., Ltd., 811 F.Supp. 1061, 1067 (M.D. Pa. 1993) ("A subsidiary is an 'alter ego' of its parent corporation if domination and control by the parent renders the subsidiary its mere instrumentality."). Indeed, "[t]he significant factor in this inquiry is the degree of control that the parent corporation retains over the subsidiary." Id. (quoting 2 James W. Moore et al., MOORE'S FEDERAL PRACTICE ¶ 4.41–1[6], at 4–368 (2d ed. 1992)).[8]

_____

[8] The dissent cites Anwar v. Dow Chem. Co., 876 F.3d 841 (6th Cir. 2017) in order to highlight the fact that Appellant does not micro-manage PBS Coals' daily operations. However, when considered in conjunction with the intricate corporate structure and oversight that we describe in the body of this memorandum, the relevant facts demonstrate a level of involvement by Appellant that exceeds the mere macro-management that the dissent depicts. For similar reasons, we are not convinced that the dissent's discussion of district court cases from California and Louisiana provides any meaningful guidance. In describing the decisions in Kellman v. Whole Foods Mkt., Inc., 313 F.Supp.3d 1031 (N.D. Cal. 2018), and Ezell v. Medtronic plc, 2018 WL 1100901 (W.D. La. Feb. 6, 2018) (not reported), the dissent isolates certain factors that the respective district courts found deficient. In Kellman, it was the district court's reference to Ranza v. Nike, Inc., 793 F.3d 1059

Courts have applied the alter-ego test with variable outcomes. In Barber v. Pittsburgh Corning Corp., 464 A.2d 323, 317 (Pa.Super. 1983), this Court affirmed a trial court order that overruled preliminary objections challenging, inter alia, Pennsylvania's authority to exert personal jurisdiction over a foreign corporation, Charter Consolidated, Ltd, ("Charter"), that conducted business in Pennsylvania through two groups of wholly-owned subsidiaries, Cape and Pandrol. Specifically, Cape sold thousands of tons of asbestos to the plaintiff's former employer, Pittsburgh Corning Corporation ("Pittsburgh Corning"), and Pandrol sold railroad track equipment in Pittsburgh. While Charter attempted to distance itself from Cape for the purposes of specific personal jurisdiction in the underlying asbestos litigation, this Court determined that the certified record demonstrated that Cape was the instrumentality of its parent corporation. Id. at 329. We reasoned,

_____

(9th Cir. 2015), for the general proposition that a parent corporation's financing and macro-management is inadequate, and in Ezell, it was the existence of distinct office space, separate accounting, and the lack of daily oversight. While the dissent stresses that Appellant did not share office space or telephone lines with PBS Coals, and emphasizes the subsidiary's authority to make major capital expenditures without formal approval, we are not persuaded by the dissent's approach of evaluating specific factors in isolation. Indeed, when viewed in their proper context, none of the foregoing factors is informative. More importantly, although the dissent concentrates on PBS Coals' formal authority to undertake major capital expenditures without Appellant's express approval, it overlooks the reality that said authority was illusory. In actuality, PBS coals was undercapitalized and entirely reliant upon Appellant's machinations to maintain cash flow. Without the means to undertake capital expenditures, PBS Coals' formal authority to do so was hollow.

Charter maintains that its relationship with Cape is not such that Cape's business transactions in Pennsylvania should be significant in supporting the in personam jurisdiction of the Pennsylvania courts over Charter. However, although Cape may technically appear to be an independent business entity, the record shows clearly the extent to which it comprises an operating arm of Charter. . . . In the course of its purchase of such firm control of Cape over several years, Cape announced the following in a prospectus accompanying its offer to buy fifty percent of all then outstanding shares:

> It is Charter's purpose to make use of the wide experience of Cape's management so that Cape can become the main channel for the expansion of Charter's industrial activities of this type; this could not be satisfactorily achieved unless Charter acquired a considerably larger holding such as would give Charter control of Cape."

The record makes it clear that since it acquired such a substantial ownership of Cape, Charter has been well represented by its own executives placed on Cape's Board of Directors, and has thereby participated in Cape's important business decisions. This total involvement by Charter in Cape's affairs was clearly significant to the lower court in its finding that through Cape, Charter has engaged in business affairs in Pennsylvania to a degree sufficient to assert in personam jurisdiction over Charter. Id. at 328-29.

In contrast, in Enterprise, supra, the United States District Court for the Western District of Pennsylvania applied the ten above-referenced factors and concluded that a Pennsylvania subsidiary was not the instrumentality of a parent company incorporated in Missouri. In sum, unlike this Court's holding in Barber, the district court determined that ownership, shared directors, common marketing images, and a unified information technology system did not implicate the parent company's control over the Pennsylvania subsidiary's internal workings or daily operations. It reasoned, "A degree of control

naturally flows from these aspects of the parent-subsidiary relationship, but this incidental control does not rise to the level required to permit the exercise of jurisdiction over the parent." Id. at 323.

Importantly, however, as it relates to the eighth factor, the subsidiary's performance of business functions that the parent company would normally conduct, the district court observed that it would have been improper to impute jurisdiction in that case because "the subsidiary is not performing a function that the parent would otherwise have had to perform itself." Id. at 394 (quoting Action Mfg. Co., v. Simon Wrecking Co, 375 F.Supp.2d 411, 422 (E.D. Pa. 2005)). In this vein, the Enterprise Court differentiated the relevant business relationships therein from the circumstances presented in two other district court decisions, wherein the courts determined that a Pennsylvania subsidiary was the alter-ego of its foreign parent corporation. See, e.g., In re Chocolate Confectionary Antitrust Litig., 641 F.Supp.2d 367 (M.D. Pa. 2009) ("Chocolate Confectionary II"); and In re Latex Gloves Prods. Liab. Litig., 2001 WL 964105 (E.D. Pa. 2001) ("Latex Gloves"). For example, while the Enterprise Court recognized that the parent corporation provided its wholly-owned subsidiary administrative services for a fee, it attributed the heightened attention to the service-centered nature of the car rental industry in which the parent and subsidiary were engaged. Id.

Similarly, the Enterprise Court deemed the diminished corporate formalities between parent and subsidiary, i.e., shared directors, common marketing images, and a unified information technology system, as secondary. Again, the court distinguished the relevant facts before it from the corporate structures in Latex Gloves, supra and Chocolate Confectionary II, supra. Specifically, the district court stated that in those cases, "numerous facts [tied] the parent to the subsidiary, such as common ownership and the provision of administrative services." Id. at 324. It found "the failure to adhere to corporate boundaries" was "[a] key fact[or] in those cases that resulted in the finding of alter-ego jurisdiction." Id. In sum, the Enterprise Court concluded,

> In both [Latex Gloves] and Chocolate Confectionary II, the failure to adhere to corporate boundaries was demonstrated by the exercise of managerial power over the operations and functions of one subsidiary or group of subsidiaries by employees of a separate but affiliated corporation. [Latex Gloves], 2001 WL 964105, at *6; Chocolate Confectionary II, 641 F.Supp.2d at 401. In this case, there is no evidence of a failure to operate within the corporate structures established among the Enterprise Rent–A–Car companies. This court cannot exercise in personam jurisdiction over [the parent company] in this case based upon the alter-ego theory.

In re Enterprise, supra at 324-25.

Subsequently, in Hooper v. Safety-Kleen Sys., Inc., 2016 WL 7212586, at *7 (W.D. Pa. 2016), another trial court from the Western District applied the same ten factors and determined that competent evidence of record supported a finding that the subsidiary was the alter ego of the foreign

parent corporation.[9]  In Hooper, Clean Harbors, Inc. ("CHI"), a Massachusetts holding company, acquired Safety-Kleen Systems, Inc. ("Safety Kleen"), a wholly-owned subsidiary that operated an industrial facility in Erie, Pennsylvania.  Including Safety Kleen, CHI owned 128 subsidiary companies that it referred to collectively as the Clean Harbors family of companies.  The Clean Harbors companies had common officers, all of whom reported to Alan McKim, CHI's founder, President, Chairman and CEO.  All of the subsidiaries used the "Clean Harbors" trademark, which CHI owned.  CHI utilized the board of directors and officers of one of its subsidiaries, Clean Harbors Environmental Services, Inc. ("CHESI"), to provide free administrative services to the remaining Clean Harbors family of companies.  Through CHESI, CHI provided business guidelines, benefit plans, information technology, insurance, and legal services.  It also negotiated and provided the full panoply of human

_____

[9] We do not rely upon the Hooper Court's ultimate holding as persuasive authority.  We observe that the procedural posture of the instant case differs from Hooper since that plaintiff had only to demonstrate a prima facie case of personal jurisdiction at the preliminary stage in the proceedings that the district court confronted the issue.  Thus, while the Hooper Court declined to dismiss the complaint for want of jurisdiction, the plaintiff retained the ultimate burden of establishing personal jurisdiction by a preponderance of the evidence before or during trial.  See Hooper, supra at *3.  Accordingly, rather than attempting to draw value out of the trial court's holding, we discuss that case simply in order to highlight the similarities between the corporate dynamics presented in it and the case at bar, and to illustrate how that framework differed from the corporate structure in other district court decisions that addressed alter ego as a basis to convey personal jurisdiction over an out-of-state parent corporation.

resource services and benefits for the entire Clean Harbors family of companies.

Upon considering the foregoing corporate structure, the Hooper Court concluded that the plaintiff established prima facie evidence of Pennsylvania's jurisdiction. The court noted that CHI owned all of the entities in the Clean Harbor family of companies, that extensive overlap existed among the officers and directors of the organizations, and that all of the officer's report to CHI's CEO directly. In addition, the court found relevant the fact that all of the companies used common marketing images, and that CHI promoted the Clean Harbors family as one entity.

In distinguishing these facts from the relevant considerations that had been determined to be insufficient to confer jurisdiction in Enterprise, the District Court reasoned,

> Clearly, the structure of the Clean Harbors corporate family creates far more inter-dependence than the corporate structure in Enterprise Rent-a-Car. In Enterprise, the subsidiaries paid for the administrative services provided by the parent; issued separate balance sheets and separate annual reports; and the subsidiaries had authority over the employment practices that led to the [underlying] claims in that case. By comparison, the Clean Harbors companies act as branches of one functionally-integrated organization, in which [the parent company] provides corporate services without cost to the subsidiaries and there is one consolidated financial statement and annual report for the whole Clean Harbors family. The Court concludes that Plaintiff has established a prima facie case sufficient to establish personal jurisdiction over [the parent company].

Hooper, supra at *8.

A review of the present case through the prism of the ten factors outlined in Estate Of Albert Francis Simeone, supra and applied in Sincavage, supra and Clark, supra, confirms that Appellant used PBS Coals as its Pennsylvania instrumentality in the steel making process and provided the undercapitalized subsidiary essential funding. When considered in conjunction with the intricate corporate structure and oversight that we describe below, the relevant facts demonstrate a level of involvement by Appellant that exceeds mere macro-management. Namely, our review of the relevant "alter ego" factors reveals a corporate scenario that aligns closely with situations that we addressed in Barber and the district courts confronted in Hooper, Latex Gloves, and Chocolate Confectionary II.

As we discuss, infra, Appellant neglected to adhere to corporate boundaries that would distinguish PBS Coals as anything other than an arm of Appellant's mining operation. Like the framework the parent employed in the foregoing cases, Appellant provided PBS Coals with extensive cost-free services and maintained a level of operational oversight that is commensurate with the attention given a functionally integrated division. In this vein, Appellant promoted PBS Coals as a component of Severstal Resources, a unified entity Appellant used to control its mining operations.

With these tenets in mind, we outline the facts that undermine the Appellant's contention that Mr. Williams's injury did not arise from Appellant's connection with PBS Coals' mining activities. In contesting Appellant's

preliminary objections to the personal injury complaint based upon, inter alia, the lack of personal jurisdiction, Mr. Williams deposed two of PBS Coals' former executives, Dmitry Goryachev and Lori Mason, Esquire, the company's Chief Financial Officer and the General Counsel, respectively. He also deposed Vadim Larin, Appellant's CEO and board member who also served as one of PBS Coals' board members during the relevant period.

Dmitry Goryachev testified that he worked for Appellant during 2009 and 2010 before he became the Chief Financial Officer ("CFO") for PBS Coals in 2011, approximately three years after Appellant acquired it in November 2008, and he remained in that position until Appellant sold the mining operation to Corsa Coal in August 2014. N.T. Deposition of Dmitry Goryachev, 7/20/16, 7-10, 29, 34. He accepted the position and moved from Russia on the advice of his manager at OAO Severstal. Id. at 9-10. In addition to his role as the CFO, Mr. Goryachev managed the business's finance, procurement, and information technology ("IT") departments. Id. at 11. He also served on PBS Coals' board of directors. Id. at 10-11, 36.

Mr. Goryachev explained that the informal unit of Appellant commonly referred to as "Severstal Resources . . . managed PBS Coals." Id. at 8. Through that arm, Appellant maintained financial oversight of its subsidiary but only required formal approval of expenditures exceeding ten million dollars. Id. at 21, 35. Thus, smaller projects like the one on which Mr. Williams worked typically did not require Appellant's authorization. Id. at 31.

Mr. Goryachev stated that he completed several trips per year to Appellant's headquarters in Moscow for budget presentations and finance conferences. Id. at 38-39. In addition to attending monthly video conferences with Appellant regarding PBS Coals' expenses and performance, he also was required to submit weekly performance sheets, monthly status reports, and a proposed annual budget to the Moscow headquarters in a specific computer format that Appellant dictated. Id. at 22-25, 34, 39. In fact, Appellant controlled PBS Coals' information technology from Moscow and, even though PBS Coals managed the content of its website, Appellant hosted the site on its Russian server. Id at 28, 86.

As it relates to the subsidiary's capitalization during his tenure, Mr. Goryachev testified that, acting through another subsidiary, Appellant issued PBS Coals a line of credit in excess of $200 million soon after Appellant acquired it. Id. at 12, 63. PBS Coals maintained positive cash flow between 2011 and 2013, but seemed to possess only sufficient capital to satisfy its payment obligations to Appellant for the $200 million loan. Id. at 16-17. Eventually, however, the repayments were suspended because PBS Coals was unable to meet that obligation. Id. at 17-18. Thereafter, Appellant arranged for PBS Coals to obtain financing from a different subsidiary in order for PBS Coals to repay its initial obligation to Appellant. Id.at 59. As of August 2014, when Appellant ultimately sold PBS Coals to Corsa Coal, the debt still had not been repaid. Id. at 29-30. While Mr. Goryachev was unsure whether

Appellant simply forgave the debt, he noted that it had not taken any legal action to collect the debt prior to the sale. Id. at 30. Likewise, although Mr. Goryachev testified that he was uncertain whether PBS Coals would have maintained adequate capitalization without the money that it saved by postponing the repayment, he conceded that, absent the forbearance, PBS Coals would have had to alter its cash flow strategy to maintain a positive cash flow. Id. at 56-57.

Attorney Mason's deposition confirmed several aspects of her colleague's testimony. She acted as the General Counsel and Vice President of PBS Coals between July 2010 and August 2014. N.T. Deposition of Lori Mason, 9/9/15, at 30, 47. Significantly, Attorney Mason illuminated the tortuous corporate structure of the holding companies, PBS Coals Canada, Mincorp Acquisition, and Mincorp, Inc., and the two physical companies located in Pennsylvania, PBS Coals and Rox Coals.[10] Id. at 37, 46. Although she represented PBS Coals and Rox Coals in her position as General Counsel, Attorney Mason technically was employed by Mincorp Inc., which occupied a higher rung in the corporate hierarchy than the mining concern. Her salary was paid by yet another subsidiary, Norwich Services, which administered the

_____

[10] Ms. Mason described the corporate chain of the North American subsidies that connect Appellant to the Pennsylvania mining operation as follows: Appellant owned three tiers of Canadian holding companies. The lowermost Canadian subsidiary, PBS Coals Canada, owned Mincorp Acquisition, which, in turn held Mincorp, Inc., which maintained PBS Coals and Rox Coal. Id. at 58-59.

executive payroll. Id. at 43-44. Attorney Mason confirmed that all of Appellant's subsidiaries utilized the identical Severstal trademark logo. Id. at 63. However, the various holding companies connected with the actual mining operations at PBS Coals and Rox Coal lacked telephone numbers or email addresses and, to her knowledge, did not have employees or a genuine purpose in the mining or steel manufacturing operation. Id. at 38-39.

As General Counsel, Attorney Mason managed all of PBS Coals' legal and government affairs. Id. at 27. Her responsibilities extended to addressing employment issues and reviewing the articles of incorporation and bylaws for PBS Coals, Rox Coal and Mincorp, Inc., because the three entities shared executives. Id. at 99-102, 108. She confirmed that PBS Coals was a wholly-owned subsidiary of Appellant, and explained that, in her role as General Counsel, she communicated with Appellant's Moscow headquarters frequently, sometimes daily. Id. at 30, 51. She also explained that Appellant engineered the $200 million loan to PBS Coals through Lybica, a gold-mining subsidiary located in the Netherlands. Id. at 31-32, 38-39, 57. She was unsure whether Lybica was yet another holding company. Id. at 39.

Like Mr. Goryachev, Attorney Mason testified that PBS Coals paid for her visits to Appellant's Moscow headquarters. Id. at 23. Similarly, she stated that PBS Coals' CEO Lynn Shanks was required to attend annual meetings and conventions with representatives from Appellant's various subsidiaries once or twice per year. Id. at 24, 26. Likewise, Appellant's executives visited the

Pennsylvania mining plant annually to review the subsidiary's financial statements and tour the facilities. Id. at 25.

Attorney Mason acknowledged that Appellant's annual report stated that it managed, inter alia, "a coking complex, PBS Coals in the USA" and used the collective phrasing "we" when referencing the decision of PBS Coals to idle inefficient mines. Id. at 76, 78. However, she maintained that Appellant was not involved in daily supervision of the mining operation. Id. at 73, 81. To the contrary, she indicated that major capital expenditures required the approval of Mincorp, Inc.'s board of directors, whom she did not identify, rather than Appellant's, ostensibly because Mincorp Inc. was the immediate owner of PBS Coals under Appellant's elaborate organizational scheme. Id. at 70-71. She identified at least one person, Vadim Larin, Appellant's CEO and the operational head of Appellant's mining subsidiaries, who simultaneously maintained positions on the board of directors for both Appellant and PBS Coals. Id. at 70-71, 81-82.

According to Attorney Mason, the construction of a raw coal bin did not require board approval because it did not exceed the ten-million-dollar threshold. Id. at 103. However, PBS Coals did not convene any board meetings during Mason's four-year tenure as General Counsel. Id. at 104. If PBS Coals' board was required to act, she would draft a resolution and transmit it to the individual members in Moscow and Pennsylvania for approval. Id. at 104-06. Some resolutions were transmitted to Appellant's

Russian headquarters "to the extent that they were sent for signature by [its] board members." Id. at 110.

Mr. Larin, Appellant's CEO and board member, referred to Appellant interchangeably as Severstal and OAO Severstal throughout his testimony. N.T. Deposition of Vadim Larin, Vol. I, 4/14/16, at 6. He confirmed that he and another of Appellant's executives, Sergey Starodubtsev, Appellant's Director of Raw Material Procurement, Sales, and Logistics, maintained seats on PBS Coals' four person board of directors while working for Appellant.[11] Id. at 6-7, 20, 27-28. In his view, Appellant and PBS Coals belonged to the same family of companies. N.T. Deposition of Vadim Larin, Vol. II, 6/2/16, at 57. While he confirmed that PBS Coals received the large loan from Lybica, he did not recall any of the specifics about the loan, terms, or interest rate, or state whether the principal was repaid. N.T. Deposition of Vadim Larin, Vol. I, 4/14/16, at 14. He did recall, however, that he discussed the credit line with PBS Coals and was aware that the mining operation was using it to help maintain a positive cash flow. N.T. Deposition of Vadim Larin, Vol.II, 6/2/16, at 43.

_____

[11] The witness later identified the board member as Sergey Kuznetsov, who was a different Severstal executive during the relevant period. See N.T. Deposition of Vadim Larin, Vol.II, 6/2/16, at 69-70. Regardless of this inconsistency, the record bears out that Appellant's executives retained at least one-half of the seats allotted on PBS Coals' board of directors.

The foregoing evidence establishes that PBS Coals was the Pennsylvania instrumentality of its Russian parent. The certified record reveals a meandering corporate structure that routed Appellant's connection to PBS Coals through various international and domestic entities, some of which were mere holding companies that lacked any corporate operations or business activities. In this regard, Appellant employed all of PBS Coals' executives through an entirely different subsidiary and used yet another subsidiary to administer the executive payroll. PBS Coals' corporate finances and production were managed by Severstal Resources, an opaque unit that Appellant used to oversee natural resource assets. To add to the confusion created by myriad subsidiaries under a unified corporate umbrella, the subsidiaries utilized the identical "Severstal" trademark and logo, the manner and depiction of which Appellant controlled.

Appellant and PBS Coals shared overlapping membership on their respective boards of directors, and Appellant controlled supervision over the subsidiary's operations. While PBS Coals maintained corporate formalities insofar as it maintained separate bank accounts and financial records, avoided common officers, records, and active personnel, and developed clearly defined functions, it shared two of its four directors with Appellant, including Appellant's CEO and its Director of Raw Material Procurement. The third director, Mr. Goryachev, was employed by Appellant immediately before he accepted a position as the subsidiary's CFO. Moreover, PBS Coals did not

convene any board meetings. If board action was required, PBS Coals generated a resolution and transmitted it to the board members individually, including the two executives at Appellant's headquarters in Moscow, for approval.

Other indicia of Appellant's influence and oversight include the fact that Appellant trained Mr. Goryachev, who accepted the position as PBS Coals' CFO at the suggestion of his Severstal manager. In addition, Appellant required all of the executives of PBS Coals, including Mr. Goryachev, to travel to Appellant's Russian headquarters several times per year. Similarly, Appellant's executives visited the PBS Coals mining operation annually to review business records and tour facilities. Appellant maintained daily contact with the legal department of PBS Coals, as Appellant deemed necessary, and mandated that other departments submit regular financial and performance reports as often as once per week. Appellant not only designated the manner in which PBS Coals submitted the periodic reports, it instructed the subsidiary to utilize technology that Appellant controlled from Moscow.

PBS Coals amounted to little more than an instrument of Appellant to source metallurgical coal for Appellant's in-house consumption, and was undercapitalized. It relied upon the $200 million loan that Appellant orchestrated through another subsidiary in order to maintain positive cash flow. In this vein, Mr. Goryachev testified that the capital that PBS Coals managed to generate was used to repay the substantial loan. Despite the

subsidiary's diligent efforts, however, it was unable to satisfy its loan obligations, and Appellant was required to eventually suspend repayment. The certified record does not reveal whether PBS Coals repaid the loan before Appellant cleaved it from the Severstal brand by selling it to a third party.

Several of the foregoing factors are consistent with a parent corporation's typical governance of a subsidiary which, when viewed individually, do not impart personal jurisdiction over the parent company per se. When severed from the remaining conditions, any one or two of these facts typically would be insufficient to convey personal jurisdiction in Pennsylvania. See, e.g., Clark, supra at 1067 ("The mere ownership of a subsidiary, even one hundred percent ownership, is not sufficient to assert that a subsidiary is the alter ego or agent of its parent corporation."); Botwinick, supra at 353-54 (neither similarity of names, total ownership of the stock, nor commonality of leadership "will per se justify a court in piercing the corporate veil if each corporation maintains a bona fide separate and distinct corporate existence."). However, this case does not present the typical parent-subsidy relationship insofar as PBS Coals is not the archetypal mining subsidiary engaged in a commercial enterprise. In the same manner that this Court found Charter's acquisition of Cape for the express purpose of channeling its industrial activities through the subsidiary to be compelling evidence of instrumentality in Barber, we highlight that Appellant acquired PBS Coals to mine an essential element in its steel-making operation. In fact,

the certified record bears out that PBS Coals was not an independently-viable company under Appellant's ownership. In actuality, PBS Coals was an undercapitalized, wholly-owned subsidiary that was dependent upon Appellant's financial assistance, whether directly or indirectly. Although PBS Coals observed corporate formalities as to separate accounts, records, and personnel, it shared one-half of its board of directors with Appellant. Moreover, considering that PBS Coals diverted its primary asset to Appellant, the significance of those corporate formalities is diminished by the reality that PBS Coals was little more than a source of coal for Appellant's steel manufacturing machine.

Correspondingly, in contrast to the diminished import of the corporate formalities, the same reality which reveals PBS Coals' function as the instrumentality of its parent heightens the significance of the countervailing factors that militate in favor of conveying personal jurisdiction. Stated plainly, unlike the dynamics of the corporate relationship required in the service-based industry that the district court addressed in Enterprise, PBS Coals is performing an essential function in the steel making process that Appellant would otherwise have to perform internally. Thus, notwithstanding the complex corporate structure that Appellant used to purchase and govern PBS Coals, we conclude that the facts associated with the international titan's utilization of the regional mining operation as an internal source of metallurgical coal subjected it to personal jurisdiction in Pennsylvania.

Finally, consistent with the requirements outlined in our long-arm statute and Bristol-Myers Squibb, supra at 1781, that an affiliation exist among the party, forum, and underlying controversy, we observe that the facts of this case establish Appellant's relationship with the Pennsylvania litigation.[12] Despite Appellant's artful manipulation of multiple subsidiaries to insulate it from responsibility for the subsidiary's liabilities, Appellant failed to maintain an arm's length relationship with the internal mining operation. Although the coal bin's construction did not require Appellant's formal approval, that fact is not dispositive considering the patent cash flow problems that PBS Coals endured after its acquisition by Appellant. It reasonably follows that the $200 million loan to PBS Coals that Appellant engineered through its other wholly-owned subsidiaries permitted PBS Coals to make capital improvements at the facility, such as the raw coal bin that Mr. Williams was constructing when the underlying injury occurred. In short, since Appellant controlled the subsidiary's purse strings and relied upon the Pennsylvania mining operation for its in-house supply of the metallurgical coal that was vital to its international steel making endeavor, its connection with Mr. Williams's injury was sufficient to extend jurisdiction over Appellant.

_____

[12] Pursuant to § 5322(c), Scope of jurisdiction, "When jurisdiction over a person is based solely upon [§ 5322], only a cause of action or other matter arising from acts . . . forming the basis of jurisdiction under subsection (b), may be asserted against him.

In conclusion, consistent with U.S. Supreme Court in International Shoe Co., and our High Court in Botwinick, and reviewing the evidence in the light most favorable to the plaintiff, we conclude that the certified record reveals that Appellant and PBS Coals were so intertwined that the Pennsylvania mining operation was the mere instrumentality of its parent. Under these circumstances, we find that the trial court did not abuse its discretion in exercising personal jurisdiction over Appellant.

For all of the foregoing reasons, we affirm the trial court's May 31, 2017 order overruling Appellant's preliminary objections to Mr. Williams's complaint on the basis that the trial court lacked personal jurisdiction.

Judge Kunselman files a Concurring Memorandum.

Judge Olson files a Concurring/Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/3/2019